Mildred DUNNELL et al., Plaintiffs,
and
John B. Bruff et al., Intervening
Plaintiffs,

v.

Richard H. AUSTIN, Defendant.

No. 37533.

United States District Court,
E. D. Michigan, S. D.

May 31, 1972.

Foster, Lindemer, Swift & Collins, Lansing, Mich., for plaintiffs.

Russell A. Searl and Solomon Bienenfeld, Lansing, Mich., for defendant Richard H. Austin.

Theodore Sachs, Detroit, Mich., for defendant Bruff.

## OPINION

KEITH, District Judge.

This is a suit to compel valid redistricting of Michigan's nineteen Congressional Districts in the light of the 1970 U. S. decennial census.

On December 10, 1971, plaintiffs Dunnell, Fletcher, Haynes and Lyle brought suit to challenge the existing Congressional districting of the State of Michigan, Act 282, Public Acts of Michigan of 1964, being M.C.L.A. § 3.51, M.S.A. § 4.24(1), and to seek judicial relief in the event the Michigan legislature did not sooner and appropriately redistrict Michigan's Congressional districts in accordance with the 1970 census. Subsequently, Messrs. Bruff, Winograd, Vagnozzi and Staebler were granted leave to intervene as parties plaintiff, as was, at a later date, Congressman James Harvey of Michigan's 8th Congressional District. The defendant is Richard H. Austin, Secretary of the State of Michigan and, under the Michigan Election Law, Act 116, Public Acts of 1954, M.C.L.A. § 168.1 et seq., M.S.A. § 6.1001 et seq., Michigan's chief election officer. See inter alia, M.C.L.A. §§ 168.31–168.35, M.S.A. §§ 6.1031–6.1035.

On January 18, 1972, all parties entered into a Stipulation (which Intervenor Harvey later joined) that Michigan's existing Congressional districting was unconstitutional by reason of population changes and shifts since 1964, and that new legislation was required.[1] As part of the Stipulation the parties agreed that, "A reasonable time by which the State Legislature shall have completed valid legislative enactment of a Congressional Redistricting Act [would be] February 29, 1972." (Stipulation, January 18, 1972, ¶ V). The parties further stipulated that, "In the event the Legislature of the State of Michigan has not enacted a valid new Congressional Redistricting Act on or before February 29, 1972, any party may move that this Court set a pre-trial hearing in the above entitled action, if possible, on or before March 3, 1972, and thereafter the Court may order the parties to present to it for consideration plans for Congressional Districting." (Stipulation, January 18, 1972, ¶ VI).

The legislature did not in fact enact a Congressional Districting law by February 29, 1972, nor thereafter. Pursuant to the Stipulation, the parties thereafter were requested to submit proposed plans of Congressional redistricting by April 6, 1972 and to argue the merits thereof on April 14, 1972. Plaintiffs Dunnell et al. timely filed three alternative plans, captioned "A," "B," and "C," on April 6, 1972, and on the same date intervening plaintiffs Bruff et al. filed a basic plan, together with a partial alternate plan as to certain districts. Neither intervenor Harvey nor the defendant Secretary of State proposed any plans. On April 14, 1972, counsel for the parties (except for the Secretary of State, who took no position) argued the merits of the respective plans and the Court took the matter under advisement. The Assistant Attorney General representing the Secretary of State advised the Court that in order for Michigan to conduct orderly Congressional elections in 1972, it was essential that (if the legislature did not sooner enact a valid plan of Congressional redistricting) the Court direct the adoption of a plan no later than the end of the first week of May, 1972 (i. e., May 5, 1972). Because the establishment of Congressional districts is initially, at least, a matter for legislative action, the Court exercised forbearance in the hope that the Michigan legislature would sooner do its duty and enact a valid Congressional districting law which, moreover, would be timely so as to enable the orderly and efficient conduct of Michigan's primary and general elections in 1972. The legislature failed to do so. On May 12, 1972, the Court was advised by all counsel in chambers that there was no likely prospect that the legislature would; and counsel requested the Court itself to adopt a valid plan, to be effective forthwith. Mindful of the election exigencies implied in the

1. The parties stipulated (¶ I) that the population figures for the current congressional districts under the 1960 and 1970 U. S. decennial census were as follows:

| DISTRICT | 1970 | 1960 |
|---|---|---|
| 1 | 391,652 | 416,667 |
| 2 | 531,935 | 414,385 |
| 3 | 482,493 | 416,580 |
| 4 | 452,404 | 404,898 |
| 5 | 456,892 | 406,319 |
| 6 | 483,958 | 408,117 |
| 7 | 496,658 | 416,239 |
| 8 | 457,493 | 407,578 |
| 9 | 458,307 | 404,789 |
| 10 | 478,784 | 403,263 |
| 11 | 415,005 | 403,469 |
| 12 | 630,466 | 411,800 |
| 13 | 321,066 | 416,452 |
| 14 | 394,461 | 417,026 |
| 15 | 511,538 | 413,973 |
| 16 | 406,011 | 414,872 |
| 17 | 413,045 | 415,948 |
| 18 | 527,262 | 416,830 |
| 19 | 565,662 | 414,389. |

The Stipulation of January 18, 1972 in further pertinent part provided: "(¶ III) The Legislature of the State of Michigan failed to enact a Congressional Redistricting Act during calendar year 1971." "(¶ IV) By reason of intervening changes in population and the intervening U. S. decennial census, Act 282 of the Public Acts of 1964 of the State of Michigan is unconstitutional and invalid."

Stipulation of the parties dated January 18, 1972, that the end of February would be the maximum reasonable period for the legislature itself to enact a new Congressional districting law, and mindful of the concerns expressed by the Assistant Attorney General on behalf of the Secretary of State at oral arguments that the end of the first week in May would represent a critical juncture in enabling the conduct of orderly elections, the Court on May 12, 1972, advised the parties that it could no longer forbear in the matter and that, consequently, it was directing forthwith the adoption of the plan of the intervening plaintiffs Bruff et al., as modified by their partial alternate plan. Such announcement was then made "so that those affected thereby will have time to plan accordingly," and the Court promised that an opinion would follow. Accordingly, this opinion is intended to set forth the views of the Court in directing the adoption of the intervening plaintiffs' plan as modified by their partial alternate plan. (Judgment to that effect was entered May 15, 1972).

■■■ As indicated above, the unconstitutionality of the present statute, Act 282, Michigan Public Acts of 1964, is patent, on which account all of the parties hereto—the plaintiffs, intervening plaintiffs, and defendant chief election officer of Michigan—stipulated to that fact and conclusion. In addition to such stipulation, the unconstitutionality of the statute and district thereunder is manifest under applicable precedents, which circumstance, of course, induced the parties to enter into the stipulation. It is manifest because, under applicable Federal precedents, Congressional districts must contain substantially equal numbers of persons to satisfy the constitutional requirement of Article I, Section 2 of the Federal Constitution, that Congressmen be chosen "by the people of the several states." Such provision means that "as nearly as practicable" one man's vote in a Congressional election must be worth as much as another's. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). More recently, the Supreme Court held that the "as nearly as practicable" standard requires a good faith effort to achieve precise mathematical equality of population in the apportionment of Congressional districts. Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). And see Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). In *Kirkpatrick,* the Court held that deviations from exact population equality which in no district exceeded 3.13%, but which could have been avoided by good faith efforts, were not justifiable on such grounds as the representation of distinct interest groups, the maintenance of political subdivision lines, the achievement of district compactness, the anticipation of population trends, or the accommodation of "political realities," etc. In any event, the population variances under the current Michigan districts, which result from population shifts since 1964, are so gross as to foreclose any substantial claim that the present statute is not on its face unconstitutional.[2]

Application of the same legal principles which require invalidation of the existing Congressional Districts leads the Court to the inescapable conclusion that the submitted plan of the intervening plaintiffs Bruff et al., as modified by their partial alternate plan as to six districts, is the superior plan which this Court should adopt.

2. On that account, and in the light of the parties' stipulation of January 18, this Court ruled earlier that a three-judge Court (which was requested by plaintiffs) was inappropriate under 28 U.S.C. §§ 2281 and 2284, no substantial issue of unconstitutionality being presented. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Jones v. Branigin, 433 F.2d 576 (CA 6, 1970).

■ The population variances in the adopted plan, detailed in the margin,[3] are minuscule. The average deviation from ideal district size (467,543) is but 2 persons (2.47368), or 0.00053%. With two exceptions, no district varies from norm by more than 4 persons, and those two exceptions are Districts 6 and 7, respectively, only 7 and 8 persons less than norm, or a maximum percentage variation from norm of only 0.00171%. The *aggregate* number of persons deviating from average in *all* districts is but 47. So tight are the approximations to exact equality that three districts, the 5th, 12th and 15th, have *no* deviations from norm; they precisely equal the ideal population district. Finally, variations from largest to smallest districts are similarly infinitesimal. The largest districts, the 4th, 10th and 11th, each have 467,547 persons, merely 4 above average, or a variation of 0.00086%. Those largest districts are but 0.00257% larger than the smallest district, the 7th, which has 467,535 persons, 8 below norm.

The ratio of the largest districts (the 4th, 10th and 11th) to the smallest (the 7th) is 1.000026:1. There appears, then, to be justification for the assertions by the intervening plaintiffs Bruff et al., that their plan (including the partial alternate) "for the first time in United States history, achieves not only the spirit but the letter of precise mathematical equality, as constitutionally urged in the cited cases, and particularly Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969)."

Plaintiffs Dunnell et al. argued that their own plans satisfied the constitutional principles cited earlier, whose application they conceded. Based upon revised U. S. census data, however, their plan "A" as "corrected"[4] appears to have a population range of 2,828, or 236 times as much as the adopted plan, while their plan "B" appears to have a range of at least 701, approximately 58 times as much as in the adopted plan.[5] (Their plan "C" was withdrawn after oral argu-

3. 

| District No. | Deviations from Average | |
| --- | --- | --- |
| | Number | Percent |
| 1 | —1 | .00021% |
| 2 | +2 | .00043 |
| 3 | +3 | .00064 |
| 4 | +4** | .00086 |
| 5 | 0 | –0– |
| 6 | —7 | .00150 |
| 7 | —8* | .00171 |
| 8 | —1 | .00021 |
| 9 | +1 | .00021 |
| 10 | +4** | .00086 |
| 11 | +4** | .00086 |
| 12 | 0 | –0– |
| 13 | —3 | .00064 |
| 14 | —1 | .00021 |
| 15 | 0 | –0– |
| 16 | —2 | .00043 |
| 17 | +1 | .00021 |
| 18 | +2 | .00043 |
| 19 | —3 | .00064 |
| Total | 47 | — |
| Average | 2,47368 | .00053 |
| Range | 12 | |
| Ratio: Largest to Smallest | 1.000026:1 | |

*–Smallest District
**–Largest District(s)

Ideal District: 467,543

4. In the course of oral arguments on the competing plans, counsel for intervening

plaintiffs filed detailed, written, criticisms of alleged errors or "discrepancies" in plans "A," "B," and "C." Plaintiffs later conceded numerous "clerical errors," which intervening plaintiffs' counsel contends are really revisions in many respects. The Court finds it unnecessary to examine such contention.

5. Plaintiffs claimed a population range for plan "A" of 69, and for plan "B" of 37; however, these figures neglected to reflect U. S. Census Bureau revisions as to the population of Monroe County, and consequently to any district in which it would be located and to the State as a whole. These changes were verified by a letter dated April 20, 1972 from the Associate Director of the Bureau of the Census, which confirmed intervening plaintiffs' contentions that because of the revisions as to Monroe County (from 118,479 to 119,172), the revised, corrected State figure is 8,883,312 and the ideal district size is 467,543. Moreover, the "corrections" made by plaintiffs in their letter to the Court dated April 20, 1972, following assertions of discrepancies in their figures by intervening plaintiffs in the course of oral arguments, further enlarged the range in their plan "A," according to intervening plaintiffs, by increasing the

ments, by letter to the Court dated April 20, 1972, for conceded substantial errors, in view of which they acknowledged "that Plan C in fact does not comply with the requirements of the equal protection clause of the United States Constitution.").

While plaintiffs Dunnell et al. argue that the population ranges in their plans "A" and "B" (presumably as corrected) are relatively minor, and that such plans, like intervening plaintiffs', are constitutionally defensible, plaintiffs Dunnell et al. misconceive the posture of this case and the responsibility of the Court.

The Court's present remedial responsibility is not to review for constitutionality a plan which a legislature has previously enacted (as with Act 282, for example), but rather, to adopt a plan from among several competing proposals when a legislature has failed to act.

■ Moreover, the strictures of Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), requiring justification of avoidable population disparities, and of *Kirkpatrick, supra,* precluding as permissible justification for such disparities a variety of familiar excuses (cited above) and forbidding even *de minimis* standards of allowable variance, 394 U.S. 531, make dubious the

suggestion of plaintiffs that when confronted with options such as these, the Court is at liberty to accept an inferior plan of population-related districting.

But again and in any event, the Court's present responsibility is not to test for validity a plan previously adopted by a legislature, but to select one of its own when the legislature has defaulted. In such circumstances it seems to the Court that even if, for purposes of argument we accept the plaintiffs' claim that "we are not compelled to render equality so equally, [that] does not persuade me that something less merits our choice." In re Apportionment of State Legislature, 373 Mich. 250 (1964), at 261, 128 N.W.2d 722, at 726 (Souris, J., concurring).

■ The Court finds this especially to be true when the plan which it has directed be adopted not only is clearly superior relative to a population standard, but also satisfies secondary criteria which would appear reasonably appropriate to a sound plan of districting. The adopted districts are contiguous. They are reasonably compact (considerably more so than the proposed districts in plans "A" and "B"). And political subdivisions have been maintained intact insofar as possible, particularly cities and townships.[6] Indeed, the Court finds

size of Plan A's district 17 to 470,227, and in reducing the size of Plan A's district 16 to 467,399. While counsel for plaintiffs did not have an opportunity to verify the claim by intervening plaintiffs that the range of plan "A's" districts was thereby increased to 2828, the range in plan A would still be at least 719 because of its failure to reflect Monroe County's and related revisions. Moreover, while intervening plaintiffs themselves disclaimed opportunity to check the accuracy of plaintiffs' "corrections" as to plan "B" (as contained in their April 20 letter to the Court), plan "B" at the least would continue to have a range of 701 persons, as compared to the 12 in intervenors' plan (as modified), and as adopted by the Court.

6. There are very limited and justifiable exceptions. For example, the boundaries of the cities of Midland and Northville are

crossed because those cities are already traversed by county lines which comprise the district boundaries. A precinct each is taken from the Cities of Livonia and Southgate to equalize the populations of the affected Congressional districts. Detroit's boundaries are crossed, as they were under the 1964 law, because of the population necessities for doing so. Population requirements similarly explain splits relative to the City of Warren, Township of Avon, and City of Troy. But the total number of cities and townships in the State which are thus divided in any degree is trivial and is in fact far less in number than under existing Michigan legislative districting (both current, In Re Apportionment of State Legislature, 373 Mich. 250, 128 N.W.2d 722 (1964), 376 Mich. 410, 137 N.W.2d 495, 138 N.W.2d 16 (1965), 377 Mich. 396, 140 N.W.2d 436 (1966), and just ordered, In the Matter of Reapportionment

that any plan reflecting necessary population equality must divide political subdivisions in some degree. And although all plans before this Court do so, the adopted plan does so to a surprisingly small degree and favorably so relative to the rejected plans.[7]

The proponents of the adopted plan further point out that the integrity of the multiple county area which is recognized in various South Eastern Michigan governmental authorities, such as SEMCOG,[8] SEMTA,[9] etc., is respected by the adopted plan. Thus, districts 1, 2 and 12–19 in the adopted plan are entirely encompassed within the SEMCOG area (except for three added townships of Sanilac County, joined for population reasons).

Relatedly, various outstate "urbanized areas," as defined by the U. S. Census Bureau, have been respected, as in the

Flint urbanized area, which is entirely included in the 7th Congressional District, and the Saginaw and Bay City urbanized areas, in the 8th.

All of the foregoing values have been achieved, it appears to the Court, without sacrifice of population requirements, or of other legitimate considerations which permissibly may be taken into account. Thus, the adopted districts substantially, if in varying degree, encompass current districts or parts thereof. There is accordingly neither a deliberate nor indifferent fragmentizing of existing Congressional districts, although neither is there an obsessive reaffirmation thereof. Obviously, in the light of population changes, to maintain existing districts and simultaneously to satisfy superior constitutional concerns is, as intervening plaintiffs argued, something akin to squaring the circle. But the

---

of the Michigan Legislature, Mich., 197 N.W.2d 249 (1972), and comparable in number to those divided under the current Congressional statute, Act 282 (Detroit, Memphis, New Baltimore, Lansing and Holland).

Numerous county lines are crossed in the adopted plan (as in the proposed plans "A" and "B", see *infra*), but inasmuch as adherence to county lines may not excuse excessive population variances, *Kirkpatrick, supra*, are not a matter of particular adherence in Michigan's legislative districting, and readily have been breached under the 1964 Congressional Districting law (for example, the present 2nd, 6th, 12th and 19th districts), there is little legitimate excuse for obsessive adherence to such lines, and certainly not at the expense of required population standards. On the other hand, there appears to have been no promiscuous abandonment of county line boundaries and it would appear that, insofar as possible and subject to the pre-eminent population criterion, such lines have been respected.

7. The adopted plan and proposed plans "A" and "B" each breach the boundaries of several cities and townships, although perhaps fewer in the adopted plan than in the others; and the affected communities are frequently the same in each of the plans. Thus, the adopted plan crosses the boundaries of the Cities of Troy, Warren, Livonia, Southgate, Detroit, North-

ville and Midland, and Avon Township—seven cities and one township. Plan "A" proposed dividing the Cities of Detroit, Sterling, Southfield, Warren, Livonia, New Baltimore, Lansing and Holland, and the Townships of Shelby, Northville and Ashland—eight cities and three townships. Plan "B" proposed division of the Cities of Flint, Warren, Livonia, Inkster, Dearborn Heights, Detroit, New Baltimore and Memphis and the Township of Clinton—eight cities and one township. Thus the adopted plan divided one less city than plans "A" and "B"; and two less townships than plan "A" and the same number (one) as plan "B." A comparable number of county lines are crossed in any of the plans, 27 in the adopted plan, 18 in plan "A" and 20 in plan "B."

8. Southeastern Michigan Council of Governments, a regional organization of Southeastern Michigan communities which have banded together as a regional planning authority under Michigan Act 281, P.A. of 1945, M.C.L.A. § 125.11 et seq., in the counties of Wayne, Oakland, Macomb, Washtenaw, St. Clair and Livingston.

9. The Southeastern Michigan Transportation Authority, a regional transportation authority, comprising the same counties (except Livingston) under M.C.L.A. § 124.405.

Court's options should not be confined merely to the single one of guaranteeing the re-election of incumbents (as plaintiffs in effect proposed)—even if such an objective, if otherwise constitutionally accomplished by the legislature, might be valid. Obviously, by its failure to agree upon any plan, the legislature has agreed neither to that objective nor to any other, and it seems an inappropriate role for the Court to so deeply enter the "political thicket" for that purpose. This is especially true in the light of allegations here made by intervening plaintiffs that the existing districts are hardly venerable (having been substantially re-defined in 1964 by Act 282) or of pristine ancestry, being allegedly the product of a partisan gerrymander. The Court has avoided entering the underbrush of that political thicket.

The Court *has* adopted a plan which clearly satisfies the highest "one man, one vote" standards without unduly disrupting existing districts. In that connection, while intervening plaintiffs' basic plan propounds districts somewhat more compact and regular, than those in their partial alternate plan which the Court has adopted, such partial alternate plan (although submitted "without recommendation") more closely approximates both plan "A" and the existing (Act 282) districts, and to that extent represents, *pro tanto*, a tacit consensus of the parties, to which the Court defers in the particular circumstances of this case. (Plan "B," it seems to the Court, has no compelling virtue in that its population disparity is considerably greater than in the adopted plan and it offers no independent claim of merit).

Under all the circumstances, the Court directs the adoption of the intervening plaintiffs' plan as modified by their partial alternate plan (as to districts 3, 4, 5, 6, 9 and 10).

## JUDGMENT

The above entitled matter having come on to be heard,

It is ordered, adjudged and decreed that Act 282, Public Acts of Michigan of 1964, being M.C.L.A. § 3.51, M.S.A. § 4.24(1), pertaining to U. S. Congressional Districts in the State of Michigan, is unconstitutional under Article I, Section 2, of the United States Constitution, because of the grossly disparate populations therein contained as reflected by the 1970 U. S. Decennial Census; and

It is further ordered, adjudged and decreed that Defendant Richard H. Austin, Secretary of State of Michigan, and, under applicable Michigan law, its chief election officer, and all election officials responsible therefor and having knowledge hereof, be and they are hereby enjoined, from and after this date, from conducting any primary, general and special elections for the office of Representative to the United States Congress by the use of the districts contained in said Act 282, Public Acts of Michigan of 1964, or from conducting any primary, general and special elections for the office of Representative to the United States Congress by the use of districts other than the districts created and directed by this Judgment; and

It is further ordered, adjudged and decreed that Defendant Richard H. Austin, Secretary of State of Michigan, and, under applicable Michigan law, its chief election officer, and all election officials responsible therefor and having knowledge hereof, be and they are hereby directed and mandated, from and after this date, to conduct all primary, general and special elections for the office of Representative to the United States Congress in accordance with this Judgment and in the districts created and directed herein; and

It is further ordered, adjudged and decreed that, from and after this date, the United States Congressional Districts for the State of Michigan be, and they are hereby adopted, created, and directed to be as set forth in the appendices hereto, being that plan as heretofore submitted to the Court by Intervening Plaintiffs Bruff, Winograd, Vagnozzi and Staebler, except as to Districts numbered three (3), four (4), five (5), six (6), nine (9), and ten (10) as to

which six districts, said intervening plaintiffs' partial alternate plan for said six districts, is adopted, created, and directed.

No costs, a public question.

## APPENDIX

### DESCRIPTION OF DISTRICTS

District
Number

1. That part of the City of Detroit (including the City of Highland Park) enclosed in a line beginning at 8 Mile Road and Greenfield and running south along Greenfield to McNichols, east along McNichols to Freeland, south on Freeland to Grove, east on Grove to Ardmore, south on Ardmore and Ardmore extended to Fullerton, east on Fullerton to the Pennsylvania Railroad, south along the Pennsylvania Railroad to the northern Dearborn city limits, east and south along the Dearborn city limits to Lonyo Avenue, south on Lonyo to Radcliffe Avenue, easterly along Radcliffe to Florida Avenue, north on Florida Avenue to Sarena Avenue, easterly on Sarena to Warren Avenue, east along Warren to McGraw Avenue, easterly along McGraw to Bangor, southerly along Bangor to the Edsel Ford Expressway, easterly along the expressway to Grand Boulevard, northerly and easterly along Grand to Dexter, northerly on Dexter to Joy, easterly along Joy to Linwood, north on Linwood to Atkinson, east on Atkinson to the John C. Lodge Expressway, south on the Lodge to Clairmount, easterly on Clairmount to Third, north on Third to Atkinson, easterly on Atkinson to Second, south on Second to Clairmount, east on Clairmount to Woodward, south on Woodward to Holbrook, east on Holbrook to Brush, north on Brush to Josephine, east on Josephine to Oakland, south on Oakland to King, east on King to Cameron, north on Cameron to Holbrook, east on Holbrook to the Grand Trunk Railway, north along the railway to the Hamtramck City limits, north and east along the Hamtramck city limits to Conant Avenue, north along Conant to Nevada, east on Nevada to Ryan, north on Ryan to Grixdale, west on Grixdale to Binder, north on Binder to Robinwood, east on Robinwood to Ryan, north on Ryan to Seven Mile Road, east on Seven Mile to Eureka Avenue, north on Eureka and Eureka extended to Eight Mile Road and west on Eight Mile Road to the point of beginning.

   Population: 467,542

2. All of Monroe County except Ash Township, that part of Washtenaw County composed of the cities of Ann Arbor, Milan, Saline, and Ypsilanti, and the townships of Ann Arbor, Augusta, Northfield, Pittsfield, Salem, Superior, York and Ypsilanti, and that part of Wayne County composed of all of Livonia except that part enclosed in a line beginning at the southern city limits and Fremont, and running north on Fremont to Grandon, east on Grandon to Middlebelt, north on Middlebelt to Chicago Street, and east on Chicago to the eastern city limits, and south and west along the city limits to the point of beginning, and all of the cities of Northville (within Wayne County) and Plymouth and the townships of Northville and Plymouth.

   Population: 467,545

3. Branch County, all of Calhoun County except Lee Township, all of Hillsdale, Jackson and Lenawee counties and that part of Washtenaw County composed of the townships of Bridgewater, Freedom, Lima, Lodi, Lyndon, Manchester, Saline, Scio, Sharon, Sylvan and Webster.

   Population: 467,540

4. Barry Township from Barry County, all of Berrien and Cass counties,

all of Kalamazoo County except Alamo Township, all of St. Joseph County, and that part of Van Buren County composed of the townships of Almena, Covert, Decatur, Hamilton and Keeler.

Population: 467,541

5. That part of Allegan County composed of the cities of Wayland and Plainwell and the townships of Dorr, Gun Plain, Leighton, Martin and Wayland, all of Barry County except Barry Township, Bellevue Township from Eaton County, Odessa Township from Ionia County, all of Kent County except the townships of Lowell and Nelson, and Grant Township from Newaygo County.

Population: 467,545

6. Lee Township from Calhoun County, all of Clinton County except Duplain and Lebanon townships, all of Eaton County except Bellevue Township, all of Ingham County, Danby Township from Ionia County, that part of Livingston County composed of the City of Howell and the townships of Cohoctah, Conway, Deerfield, Genoa, Hamburg, Handy, Howell, Iosco, Marion, Oceola, Putnam and Unadilla, that part of Shiawassee composed of the cities of Corunna, Durand, Laingsburg, Owosso and Perry, and the townships of Antrim, Bennington, Caledonia, Middlebury, Owosso, Perry, Sciota, Shiawassee, Vernon and Woodhull, and from Washtenaw County the Township of Dexter.

Population: 467,545

7. Genessee County, that part of Saginaw County composed of the townships of Albee, Birch Run, Maple Grove and Taymouth, that part of Shiawassee County composed of the townships of Burns, Hazelton and Venice, and from Tuscola County the Township of Arbela.

Population: 467,535

8. That part of Arenac County composed of the City of Standish and the townships of Lincoln and Standish, all of Bay County except the townships of Beaver and Gibson, all of Huron and Lapeer counties, that part of Saginaw County composed of the cities of Frankenmuth, Saginaw and Zilwaukee and the townships of Blumfield, Bridgeport, Buena Vista, Carrollton, Frankenmouth, James, Kochville, Saginaw, Spaulding, Swan Creek, Thomas, Tittabawassee and Zilwaukee, all of Sanilac County except the townships of Buel, Fremont and Worth, and all of Tuscola County except Arbela Township.

Population: 467,542

9. That part of Allegan County composed of the cities of Allegan, Fennville, Holland (part) and Otsego, and the townships of Allegan, Casco, Cheshire, Clyde, Fillmore, Ganges, Heath, Hopkins, Laketown, Lee, Manlius, Monterey, Otsego, Overisel, Salem, Saugatuck, Trowbridge, Valley and Watson, that part of Benzie County composed of the City of Frankfort and the townships of Blaine, Crystal Lake, Gilmore and Joyfield, from Kalamazoo County the Township of Alamo, that part of Lake County composed of the townships of Elk, Lake, Peacock, Pleasant Plains, Sauble, Sweetwater and Webber, all of Manistee County except Springdale Township, all of Mason and Muskegon counties, that part of Newaygo County composed of the cities of Fremont and Newaygo and the townships of Ashland, Beaver, Bridgeton, Dayton, Denver, Garfield, Lilley, Lincoln, Merrill, Sheridan, Sherman and Troy, all of Oceana and Ottawa Counties that part of Van Buren County composed of the cities of Bangor, Gobles, Hartford and South Haven and the townships of Antwerp, Arlington, Bangor, Bloomingdale, Columbia, Geneva, Hartford, Lawrence, Paw Paw, Pine Grove, Porter, South Haven and Waverly.

Population: 467,547

10. The townships of Helena and Mancelona from Antrim County, that part of Arenac County composed of the cities of Au Gres and Omer and the townships of Adams, Arenac, Au Gres, Clayton, Deep River, Mason, Moffatt, Sims, Turner and Whitney, from Bay County the townships of Beaver and Gibson, that part of Benzie County composed of the townships of Almira, Benzonia, Colfax, Homstead, Inland, Lake, Platte and Weldon, all of Clare County, Duplain and Lebanon townships from Clinton County, Beaver Creek Township from Crawford County all of Gladwin, Grand Traverse and Gratiot counties, all of Ionia County except the townships of Danby and Odessa, all of Isabella and Kalkaska counties, the townships of Lowell and Nelson from Kent County, that part of Lake County composed of the townships of Chase, Cherry Valley, Dover, Eden, Ellsworth, Newkirk, Pinora and Yates, all of Leelanau County, Springdale Township from Manistee County, all of the counties of Mecosta, Midland, Missaukee and Montcalm, that part of Newaygo County composed of the City of White Cloud and the townships of Barton, Big Prairie, Brooks, Croton, Ensley, Everett, Goodwell, Home, Monroe, Norwich and Wilcox, all of the counties of Ogemaw, Osceola and Roscommon and that part of Saginaw County composed of the townships of Brady, Brant, Chapin, Chesaning, Fremont, Jonesfield, Lakefield, Marion, Richland and St. Charles, that part of Shiawassee County composed of the townships of Fairfield, New Haven and Rush, and all of Wexford County.

    Population: 467,545

11. The counties of Alcona, Alger, Alpena, all of Antrim County except Helena and Mancelona townships, all of the counties of Baraga, Charlevoix, Cheboygan and Chippewa, all of Crawford County except Beaver Creek Township, and all of the counties of Delta, Dickinson, Emmet, Gogebic, Houghton, Iosco, Iron, Keweenaw, Luce, Mackinac, Marquette, Menominee, Montmorency, Ontonagon, Oscoda, Otsego, Presque Ile and Schoolcraft.

    Population: 467,547

12. That part of Macomb County composed of the cities of Fraser, Memphis, Mt. Clemens, New Baltimore, Richmond, Roseville, St. Clair Shores, and Utica and the townships of Armada, Bruce, Chesterfield, Clinton, Harrison, Lake, Lenox, Ray, Richmond, Shelby and Washington; that part of Oakland County composed of the City of Rochester and that part of Avon Township east of a line beginning at the southern limits of the township at Rochester Road and running north on Rochester to Wabash, west on Wabash to Hickory Lawn, north on Hickory Lawn to Stark, west on Stark to Juengel, north on Juengel to Kalhaven, east on Kalhaven to Rochester, north on Rochester to Boyken, west on Boyken to Juengel, north on Juengel to Hamlin Road, east on Hamlin to Rochester, north on Rochester to Avon, west on Avon to Livernois and north on Livernois to the northern boundary of the township; that part of Sanilac County composed of the townships of Buel, Fremont, and Worth; and all of St. Clair County.

    Population: 467,543

13. That part of the City of Detroit (including Belle Isle) enclosed by a line beginning at West Grand Boulevard and the Detroit River and running north along the Boulevard to Fort Street, west on Fort to McKinstry, north on McKinstry to the New York Central Railroad, west along the New York Central to the Canadian National Railroad, northeasterly along the Canadian National to West Grand Boulevard, northerly and easterly along the Boulevard to Dexter Avenue, north-

erly along Dexter to Joy Road, easterly along Joy to Linwood, northerly on Linwood to Atkinson Avenue, easterly on Atkinson to the John C. Lodge Expressway, southerly along the Lodge to Clairmount, easterly on Clairmount to Third, northerly on Third to Atkinson, easterly on Atkinson to Second, southerly on Second to Clairmount, easterly on Clairmount to Woodward, southerly on Woodward to Holbrook, easterly on Holbrook to Brush, northerly on Brush to Josephine, easterly on Josephine to Oakland, southerly on Oakland to King, easterly on King to Cameron, northerly on Cameron to Holbrook, easterly on Holbrook to the Grand Trunk Railroad, northerly on the Grand Trunk to the city limits of Hamtramck, east, south, east, north and east along the Hamtramck city limits to Miller Avenue, easterly along Miller to Mt. Elliott Street, north on Mt. Elliott to Huber, east on Huber to St. Cyril Street, northerly on St. Cyril to Grinnell Avenue, east on Grinnell to French Road, southerly on French to Gratiot, northerly on Gratiot to Conner, southerly on Conner to the Edsel Ford Expressway, easterly along the expressway to Philip Avenue, southerly on Philip to Warren Avenue, easterly on Warren to Alter Road, southerly along Alter to Lozier, easterly on Lozier to Wayburn Avenue, southerly along Wayburn to the Detroit city limits, southerly along the Detroit city limits to the Detroit River, then westerly along the Detroit River to the point of beginning.

Population: 467,540

14. That part of Macomb County composed of the cities of Center Line, and East Detroit and that part of Warren south of a line beginning at the western city limits at Eleven Mile Road and running east along Eleven Mile Road to La Rose Drive, north on La Rose Drive to Santa Anna, north on Santa Anna to Garbor, east on Garbor to Hoover Road, north on Hoover to Susan Avenue, east on Susan to Shacket, south on Shacket to Carol Avenue, east on Carol to Wagner Avenue, south on Wagner to Eleven Mile Road, east on Eleven to Shellborne Drive, north on Shellborne to Carol Avenue, east on Carol to Schoenherr Street, north on Schoenherr to Martin Road and east on Martin Road to the eastern city limits; and that part of Wayne County composed of that part of Detroit enclosed in a line beginning at the intersection of Mack Avenue and Wayburn and running northerly on Wayburn to Lozier Street, west on Lozier to Alter Road, northerly on Alter to Warren Avenue, westerly on Warren to Philip Avenue, northerly on Philip to the Edsel Ford Freeway, westerly along the freeway to Conner Avenue, northerly along Conner to Gratiot, southwest along Gratiot to French Road, northwest along French to Grinnell, west along Grinnell to St. Cyril, southerly on St. Cyril to Huber, west on Huber to Mt. Elliott, south on Mt. Elliott to Miller, west on Miller to the Hamtramck city limits, northerly and westerly along the Hamtramck city limits to Conant, northerly along Conant to Nevada, east along Nevada to Ryan, north on Ryan to Grixdale Avenue, west on Grixdale to Binder Avenue, north on Binder to Robinwood, east on Robinwood to Ryan, north on Ryan to Seven Mile Road, east on Seven Mile to Eureka Avenue, north on Eureka and Eureka extended to Eight Mile Road, East on Eight Mile Road to the Harper Woods city limits, and southerly along Detroit's eastern city limits to the point of beginning and all of the cities of Hamtramck, Harper Woods, Grosse Pointe, Grosse Pointe Farms, Grosse Pointe Park and Grosse Pointe Woods and Grosse Pointe Township.

Population: 467,542

15. Ash Township from Monroe County and that part of Wayne County composed of all of the cities of Belleville, Dearborn Heights, Flat Rock, Garden City, Gibraltar, Inkster, Rockwood, Taylor, Wayne, Westland, and Woodhaven, that part of Livonia enclosed by a line beginning at the southern city limits at Fremont and running north on Fremont to Grandon, east on Grandon to Middlebelt, north on Middlebelt to Chicago Street, east on Chicago to the eastern city limits and south and west along the city limits to the point of beginning, and all of the City of Southgate except that part enclosed in a line beginning at the northern city limits at Toledo Road and running south on Toledo Road to Ward, east on Ward to James, south on James to Edison, east on Edison to Howard, north on Howard to Ward, east on Ward to Barberry, south on Barberry to Edison, east on Edison to the city limits and north and west along the city limits to the point of beginning and the townships of Brownstown, Canton, Huron, Romulus, Sumpter and Van Buren.

Population: 467,543

16. That part of Wayne County composed of all of the cities of Allen Park, Dearborn, Ecorse, Lincoln Park, Melvindale, River Rouge, Riverview, Trenton, Wyandotte, and that part of Southgate not included in District 15 and that part of Detroit enclosed in a line beginning at Heyden Avenue at West Warren and running east on Warren to Greenfield Avenue, south on Greenfield to the city limits and west, south, and westerly and north along the city limits to the point of beginning, that part of Detroit beginning at Lonyo Avenue at the eastern city limits of Dearborn and running southeast along Lonyo to Radcliffe, easterly along Radcliffe to Florida Avenue, north on Florida to Sarena Avenue, easterly along Sar-

ena to Martin, north on Martin to West Warren, east on Warren to McGraw and northeasterly on McGraw to Bangor, southerly on Bangor to the Edsel Ford Expressway, easterly on the expressway to West Grand, south on Grand to the Canadian National Railway, southwest along the railway to the New York Central Railroad, east along the railroad to McKinstry, south along McKinstry to Fort Street, east on Fort to Grand Boulevard, south on the Boulevard to the Detroit River, westerly along the Detroit River and continuing along the Detroit city limits to the point of beginning and Grosse Ile Township.

Population: 467,541

17. That part of Oakland County composed of the cities of Farmington, Lathrup Village and Southfield and the Township of Farmington, and that part of the City of Detroit enclosed in a line beginning at Greenfield Avenue and the northern city limits and running south on Greenfield to McNichols, east on McNichols to Freeland, south on Freeland to Grove, east on Grove to Ardmore, south along Ardmore to Fullerton Avenue, east on Fullerton to the Pennsylvania Railroad, south along the railroad to the Dearborn city limits, west and south along the Dearborn city limits to West Warren Avenue, west on Warren to the Detroit city limits and continuing west, northerly and east along the Detroit city limits to the point of beginning and the Township of Redford.

Population: 467,544

18. That part of Macomb County composed of all of the City of Sterling Heights and that part of the City of Warren north of a line beginning at the western city limits at Eleven Mile Road and running east along Eleven Mile to La Rose Drive, north on La Rose to Santa Anna, north on Santa Anna to Garbor Street, east on Garbor to Hoover Road,

north on Hoover to Susan Avenue, east on Susan to Shacket, south on Shacket to Carol Avenue, east on Carol to Wagner Avenue, south on Wagner to Eleven Mile Road, east on Eleven Mile to Shellborne Drive, north on Shelborne to Carol Avenue, east on Carol to Schoenherr Street, north on Schoenherr to Martin Road and east on Martin Road to the eastern city limits; and that part of Oakland County composed of all of the cities of Berkley, Clawson, Ferndale, Hazel Park, Huntington Woods, Madison Heights, Oak Park, Pleasant Ridge and Royal Oak and all of Troy except that part bounded by a line beginning at the northern city limits at Rochester Road and running south on Rochester to Lovell, west on Lovell to Donaldson, north on Donaldson to the city limits and east along the city limits to the point of beginning, and Royal Oak Township.

Population: 467,545

19. That part of Livingston County composed of the City of Brighton, and the townships of Brighton, Green Oak, Hartland and Tyrone, and that part of Oakland County composed of all of the cities of Birmingham, Bloomfield Hills, Keego Harbor, Northville, Novi, Orchard Lake, Pontiac, South Lyon, Sylvan Lake, Walled Lake, Wixom and that part of Troy not in District 18, and all of the townships of Addison, Bloomfield, Brandon, Commerce, Groveland, Highland, Holly, Independence, Lyon, Milford, Novi, Oakland, Orion, Oxford, Pontiac, Rose, Southfield, Springfield, Waterford, West Bloomfield, White Lake, and that part of Avon Township west of a line beginning at the northern township limits at Livernois and running south along Livernois to Avon Road, east on Avon Road to Rochester Road, south on Rochester to Hamlin Road, west on Hamlin Road to Juengel, south on Juengel to Boyken, east on Boyken to Rochester, south on Rochester to Kalhaven,

west on Kalhaven to Juengel, south on Juengel to Stark, east on Stark to Hickory Lawn, south on Hickory Lawn to Wabash, east on Wabash to Rochester Road and south on Rochester to the township limits.

Population: 467,540