Pat O'SULLIVAN, John Schmidt, Leonard Moore, Eva Jane Vaughn, Verdis Robinson, Mary Ladesic, Alois G. Befort, Jr., and Nathaniel Watson, Plaintiffs,

v.

Jack H. BRIER, Secretary of State of the State of Kansas, Defendant.

Walter W. CARSON, Paul N. Bahnmaier, J. Kurt von Achen, and Vallerie Ann Miller, Plaintiffs,

v.

John CARLIN, Governor of the State of Kansas, and Jack H. Brier, Secretary of the State of Kansas, Defendants.

Nos. 82–1335, 82–4096.

United States District Court, D. Kansas.

June 3, 1982.

sis earlier stated in the text of this opinion

most significant.

Arnold Berman, Kansas City, Kan., for plaintiffs Pat O'Sullivan, John Schmidt, Leonard Moore, Eva Jane Vaughn, Verdis Robinson, Mary Ladesic, Alois G. Befort, Jr., and Nathaniel Watson.

Eugene W. Hiatt of Hiatt, Hiatt & Carpenter, Topeka, Kan., for plaintiffs Walter W. Carson, Paul N. Bahnmaier, J. Kurt von Achen, and Vallerie Ann Miller.

Dan Biles and Patricia A. Reeder, Asst. Attys. Gen., State of Kan., Topeka, Kan., for defendant Jack H. Brier, Secretary of State of the State of Kan.

Jerry K. Levy, Topeka, Kan., for defendant John Carlin, Governor of the State of Kan.

Before LOGAN, Circuit Judge, and ROGERS and KELLY, District Judges.

LOGAN, Circuit Judge.

These cases, before a three-judge panel convened pursuant to 28 U.S.C. § 2284(a), challenge the constitutionality of the existing congressional districts in Kansas and ask this Court to adopt a new congressional redistricting plan.

After the Census Bureau released the 1980 census figures, the Clerk of the United States House of Representatives informed Kansas Governor John Carlin that the number of congressional seats for the State of Kansas would remain at five. Thereafter, the Kansas legislature attempted to enact a new redistricting law to comport with those census figures. The House and the Senate passed and sent to the Governor two reapportionment acts, S. 664 and S. 561, but the Governor vetoed both.

The day following the Governor's veto of the second bill, S. 561, Pat O'Sullivan, John Schmidt, Leonard Moore, Eva Jane Vaughn, Verdis Robinson, Mary Ladesic, Alois G. Befort, Jr., and Nathaniel Watson (collectively, O'Sullivan plaintiffs) brought an action for declaratory and injunctive relief against Kansas Secretary of State Jack N. Brier, asking this Court to find that the existing Kansas congressional districts are in violation of Article I, section 2 and the Fourteenth Amendment of the United States Constitution, as well as 42 U.S.C. §§ 1981 and 1983. In their complaint, the O'Sullivan plaintiffs argued a three-judge panel must decide what redistricting plan should be used for the 1982 elections because the 1980 census figures establish that the current congressional districts are unconstitutional, and because the Kansas legislature failed to enact a plan and was unlikely to do so before adjournment or in time for a "proper, fair, and orderly 1982 Congressional election in the State of Kansas." Subsequently, these plaintiffs submitted a proposed plan (the O'Sullivan plan) for our consideration.

On May 5, 1982, Walter W. Carson, Paul N. Bahnmaier, J. Kurt von Achen, and Vallerie Ann Miller (collectively, Carson plaintiffs) brought an action against Governor Carlin and Secretary of State Brier, making many of the same allegations as the O'Sullivan plaintiffs. However, in their complaint the Carson plaintiffs contended that S. 561, the last bill passed by the two houses of the legislature, is a constitutionally acceptable plan this Court should adopt.

On May 14, 1982, the Kansas legislature adjourned without having enacted a new redistricting plan. The parties have agreed

that the existing congressional districting is constitutionally infirm and that the legislature will not reconvene before the June 21 filing deadline for congressional candidates seeking election this fall. Because both cases raise the same questions and ask us to adopt a new redistricting plan, we consolidated them for trial. With the parties' agreement, we accelerated the trial so that we can timely adopt a new plan.

The O'Sullivan plaintiffs, supported by the Governor, present a plan very close to a bill unsuccessfully urged upon the Kansas legislature by the Democratic minority. They assert that the maximum population variations between districts in their plan— 0.11%—is within constitutional limits, and that their plan more fully accomplishes what the Kansas legislature's joint committee charged with the reapportionment task set as a major goal: not splitting county, municipal, or township boundaries unless absolutely necessary to meet population variance requirements. They also urge that their plan restores the strength of the black vote diluted by the existing split of Wyandotte County, and more nearly meets the other criteria approved in Supreme Court and other reapportionment cases.

The Carson plaintiffs and the Secretary of State present essentially the views of the Republican majority in the Kansas legislature. They urge that we adopt a redistricting plan identical or similar to that contained in S. 561, which the Kansas House and Senate passed and the Governor vetoed. They assert that the maximum population variations between districts under the S. 561 plan—0.09%—are within acceptable constitutional limits, and urge us to adopt S. 561 for two principal reasons: (1) in deference to the good-faith efforts of the legislators, whose views presumably reflect most of their constituencies; and (2) because the plan departs the least from current congressional lines and hence reassigns fewer people from one district to another.

We consider first whether we owe deference either to the plan passed by the legislature and vetoed by the Governor, or to the plan now supported by the Governor but rejected by the legislature. Congressional redistricting is primarily the state legislature's task, but becomes a judicial task when the legislature fails to redistrict after having an adequate opportunity to do so. *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973). Although a federal court should defer to any enacted, constitutionally acceptable state redistricting plan, *id.* at 795, 93 S.Ct. at 2354, we are not required to defer to any plan that has not survived the full legislative process to become law. *See Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 197, 92 S.Ct. 1477, 1484, 32 L.Ed.2d 1 (1972). In *Beens*, after the Minnesota legislature had reapportioned state legislative districts and the Governor had vetoed the legislation, a three-judge panel adopted a reapportionment plan. The Supreme Court, though disapproving the panel's plan, agreed with the panel that it was not required to defer to either the legislature's or the Governor's plan: "The present Governor's contrary recommendation, though certainly entitled to thoughtful consideration, represents only the executive's proffered current policy, just as the reapportionment plan he vetoed ... represented only the legislature's proffered current policy." *Id.* In accordance with *Beens* we are bound to give only "thoughtful consideration" to plans that were passed by the state legislature but subsequently vetoed by the Governor, or to plans urged by the Governor. *See Carstens v. Lamm*, 543 F.Supp. 68 at 78–80 (D.Colo.1982).

In the circumstances before us, with the 1971 Kansas redistricting plan being constitutionally unacceptable and the legislature having failed to enact a new redistricting plan, our powers are broad. We may adopt in whole a proposed plan, *see Donnelly v. Meskill*, 345 F.Supp. 962 (D.Conn.1972); *Dunnell v. Austin*, 344 F.Supp. 210 (E.D. Mich.1972); *David v. Cahill*, 342 F.Supp. 463 (D.N.J.1972); *Skolnick v. State Electoral Bd. of Ill.*, 336 F.Supp. 839 (N.D.Ill.1971), adopt a proposed plan with some modifica-

tions, or draw up a new plan, *see Carstens v. Lamm,* 543 F.Supp. 68 (D.Colo.1982); *Preisler v. Secretary of Missouri,* 341 F. Supp. 1158 (W.D.Mo.), *aff'd sub nom. Danforth v. Preisler,* 407 U.S. 901, 92 S.Ct. 2440, 32 L.Ed.2d 678 (1972); *Maryland Citizens Comm. for Fair Congressional Redistricting, Inc. v. Tawes,* 253 F.Supp. 731 (D.Md.), *aff'd sub nom. Alton v. Tawes,* 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966).

■ The only relevant constitutional requirement imposed upon a plan we adopt is that it must make "as nearly as is practicable one man's vote in a congressional election … be worth as much as another's." *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–530, 11 L.Ed.2d 481 (1964). This requirement is the "preeminent, if not the sole, criterion" for evaluating the constitutionality of redistricting plans. *Chapman v. Meier,* 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975); *accord, Mahan v. Howell,* 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973) (equality of population alone is sole criterion). Of course, the plan must not discriminate on the basis of race. *See, e.g., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973). But although the existing districts dilute the block voting power of the black minority in Wyandotte County because it is split between two districts and S. 561 would continue that effect, no evidence has been presented that the present districts or S. 561 disenfranchises blacks or invidiously discriminates against them on the basis of race. The dilution of black voting power, therefore, is simply a factor to be considered along with others we discuss below.

Courts frequently face situations in which several redistricting plans achieve virtually identical levels of population equality. In these cases, courts have considered such factors as (1) whether a proposed plan preserves county and municipal boundaries, *see Carstens,* 82, 88 (unnecessary fragmentation undermines ability of constituencies to organize effectively and increases likelihood of voter confusion regarding other elections based on political

subdivision geographics); *Shayer v. Kirkpatrick,* 541 F.Supp. 922 at 933 (W.D.Mo. 1982), *aff'd sub nom. Schatzle v. Kirkpatrick,* —— U.S. ——, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982); *Dunnell,* 344 F. Supp. at 216 n.7; *David,* 342 F.Supp. at 469; *Preisler,* 341 F.Supp. at 1162; *Skolnick,* 336 F.Supp. at 846; (2) whether a plan dilutes the vote of any racial minority; *Carstens,* at 82; *Shayer,* at 930–931; (3) whether a plan creates districts that are compact and contiguous, *Carstens,* at 82, 87–88 (prevents partisan gerrymandering, reduces electoral costs, and increases effective representation); *Shayer,* at 931; *David,* 342 F.Supp. at 469; *Skolnick,* 336 F.Supp. at 843; *Tawes,* 253 F.Supp. at 734; (4) whether a plan preserves existing congressional districts, *Dunnell,* 344 F.Supp. at 216; and (5) whether a plan groups together communities sharing common economic, social, or cultural interests, *see Carstens,* at 82, 90–91; *Skolnick* 336 F.Supp. at 845; *Tawes,* 253 F. Supp. at 734.

■ Essentially all of these concerns were expressed in the testimony presented before this Court and before the legislative committees that considered reapportionment plans. The objectives adopted by the legislative reapportionment committees embraced most of these concerns as goals. In evaluating the plans presented to the Court and in considering alternatives, we sought to apply these factors.

We attach great importance to the preservation of county and municipal boundaries. The joint legislative committee formally established this goal, apparently as the most important factor after the need to achieve constitutionally acceptable population variances. We believe that county lines are meaningful in Kansas, and that a redistricting plan should split counties only if absolutely necessary to maintain a constitutional population variance. The Kansas counties have historically been significant political units. Many officials are elected on a county-wide basis, and political parties have been organized in county units. Elec-

tion of members of Congress is a political process requiring political organizations. Additionally, to a degree most counties are economic, social, and cultural units, or parts of a larger socio-economic unit. While many counties have both an urban and a rural flavor, the growth of suburban living has blurred the distinction in those counties that contain or are near cities of significant size.

While we agree with the Carson plaintiffs that the present allocation of minority groups raises no constitutional issue, splitting the large minority population of Wyandotte County between two districts is undesirable unless compelled by some significant reason. Minorities find it difficult to make their views count in a political system in which majorities rule; being able to maintain block voting strength in areas where they live closely together, as in Wyandotte County, helps them make their voices felt.

We are also concerned with compact and contiguous districts, but neither plan presented to us varies significantly in that respect; both are as good as can be expected considering the distribution of the population among counties in Kansas.

The Carson plaintiffs assert it is important that S. 561 comes closest to preserving prior congressional district lines by reassigning the fewest possible people from one district to another. It is a valid point. But the Governor asserts the counties should never have been split in the first place, and perpetuating that split would constitute two wrongs, which would not make a right. The O'Sullivan plan requires considerable shifting, but most of it is necessary to reunite the 539,423 residents of Wyandotte and Sedgwick Counties. Neither S. 561 nor the O'Sullivan plan would move an incumbent congressman from his present district.

Finally, we consider as the lodestar of our analysis the grouping together of as many major communities of common economic, social, and cultural interests as possible without breaking county lines, if the resulting district realignment would not result in unconstitutional population deviations. After carefully considering a number of alternatives, including those submitted to the legislative reapportionment committees and all bills presented to the Kansas legislature, we conclude that the best plan, which we now adopt, is the one introduced by Senator Jack Steineger. It is virtually identical to the O'Sullivan plan, except that it keeps Reno County intact in the Fourth District. We reasoned to this conclusion from the premises stated above, substantially as follows.

The first important decision was placement of Wyandotte County. Whatever the historical justifications for dividing that county (apparently along rural versus urban lines), the expert testimony indicated that in several respects Wyandotte County is unique. It is densely urban, industrial, economically depressed, and contains approximately one-third of the black minority population in the state. Except for historical reasons, the division of Wyandotte County between the Second and Third Districts contemplated by S. 561 makes no sense at all. Therefore, we concluded that the whole county should be in the same congressional district.

Looking then to what other counties should be placed in that district, the logic is unavoidable that Johnson County and Wyandotte County should be placed in one district. They represent the Kansas portion of greater Kansas City, a major socio-economic unit. Although Johnson County is more affluent and fewer minorities live there, it is heavily populated and shares with Wyandotte County the concerns of outlying metropolitan areas. The ties that bind the two counties together economically, politically, and culturally are significantly greater than those that divide them.

Leavenworth arguably is also part of the greater Kansas City metropolitan area, but certainly to a lesser degree than Wyandotte and Johnson Counties. Adding Leavenworth to Wyandotte and Johnson Counties, however, would exceed permissible population deviation limits, as would joining Douglas County, which historically has been part of the Third District. Therefore, we concluded that the Third Congressional Dis-

trict should comprise Wyandotte, Johnson, Miami, and Linn Counties, as they were grouped on virtually every map presented to the various legislative committees that did not split Wyandotte County.

The next important decision was to determine where we should place Douglas County, whether in the Second or the Fifth District. Based on the expert testimony, we concluded that Douglas belongs in the Second District since it, Shawnee, and Riley Counties have significant social, cultural, and economic ties, and potential for developing a high technology community along the Kansas River valley. Douglas and Riley Counties contain the state's two largest universities. They are both linked to Topeka, the state capital located in Shawnee County, because of the many state employees, educational connections, economic, educational, and social projects, and other demographic factors. Also, the Second District will include the two major military reservations in Kansas, located in Leavenworth and Riley Counties.

We were reluctant to place Marshall County in the First District because, while it would be contiguous, it would be at the outer edge of the largest district and a great distance from many of the other counties in the First District. Clay County is closer to the other counties in the First District, but we could not substitute Clay County for Marshall in the First District without creating population deviation problems. Further, prior to 1971 Clay County was part of the Second District to which we are returning it.

The next important decision was determining the boundaries of the Fourth District. Logically it should encompass Sedgwick County and the socio-economic community related to Wichita, Kansas's largest city. However, Wichita's social, economic, and cultural influence affects an area larger than can be encompassed in one congressional district. Therefore, we had to decide which counties surrounding Wichita to exclude. We were reluctant to remove McPherson and Harvey Counties from the Fourth District, but they have demographic characteristics in common with each other, with Marion, and other nearby counties. Straddling the Sedgwick and Sumner county line is Mulvane, the Kansas city most severely split by a county line, which argues for keeping those two counties together. Therefore, logic and our concern for staying within constitutional variance limits compelled us to adopt the Fourth District as set out in the O'Sullivan plan except for that plan's exclusion of three townships in Reno County. As we relate below, we do not think those townships must be separated to have a constitutional plan, and we concluded that the Fourth District should consist of all of Sedgwick, Reno, Sumner, Kingman, and Harper Counties.

The First District contains counties that are primarily agricultural. It encompasses almost all of "Western" Kansas with as many adjoining agriculturally oriented counties as necessary to meet equal population requirements.

The Fifth District contains the counties in the southeast part of the state. While there is some diversity among these counties, several groups of counties share similar socio-economic characteristics.

Adoption of Senator Steineger's plan (or O'Sullivan plan as modified) provides districts with population figures and deviation from the ideal population as follows:

| | Population | Deviation from 472,847 ideal | | |
|---|---|---|---|---|
| First District | 472,139 | −708 | or | −0.150% |
| Second District | 472,988 | +141 | or | +0.030% |
| Third District | 472,456 | −391 | or | −0.083% |
| Fourth District | 473,737 | +890 | or | +0.188% |
| Fifth District | 472,916 | +69 | or | +0.015% |

Maximum population deviation:[1] 0.338% or 1598 people.

We have considered whether this plan's population deviation meets the Constitution's "as nearly as practicable" one person-

---

1. "Maximum population deviation" is the difference in population between the largest and smallest districts divided by the "ideal district population." The "ideal district population" is equal to the total state population divided by the total number of districts. The stipulated total population of Kansas is 2,364,236, and the ideal district population is 472,847 persons.

one vote requirement, and conclude that it does. While the Supreme Court has rejected the argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimus*, *Kirkpatrick v. Preisler*, 394 U.S. 526, 530, 89 S.Ct. 1225, 1228, 22 L.Ed.2d 519 (1969), it has recognized the difficulty of drawing congressional districts with mathematical precision, *Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535. Accordingly, although the Court has rejected a New York plan with a total population deviation of 13.09%, *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), and a Missouri plan with a population deviation of 5.97%, *Kirkpatrick*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519, it has approved a Texas plan with a total population deviation of 0.149%, *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), a Missouri plan with a deviation of 0.18%, *Schatzle v. Kirkpatrick*, —— U.S. ——, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982), aff'g, *Shayer v. Kirkpatrick*, 541 F.Supp. 922 (W.D.Mo.1982), and a Maryland plan with a deviation of 2.5%, *Alton v. Tawes*, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966), *aff'g, Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes*, 253 F.Supp. 731 (D. Md.1966). Three-judge panels have approved or adopted plans ranging from a total population deviation of 0.0020%, *Carstens v. Lamm*, 543 F.Supp. 68 (D.Colo. 1982), to a deviation of 3.79%, *Drum v. Scott*, 337 F.Supp. 588 (M.D.N.C.1972). *See also Dunnell v. Austin*, 344 F.Supp. 210 (E.D.Mich.1972) (0.00257%); *West Virginia Civil Liberties Union v. Rockefeller*, 336 F. Supp. 395 (S.D.W.Va.1972) (0.078%); *Skolnick v. State Electoral Bd. of Ill.*, 336 F.Supp. 839 (N.D.Ill.1971) (1.14%).

If we were to adopt the O'Sullivan plan in its entirety, it would shift three Reno County townships to the First District, thereby reducing the maximum deviation to 0.11%. Perhaps *Kirkpatrick* can be read to require not only that, but additional shifts of townships or other voter units if it will reduce even further the population variance. Modern computer technology would permit us to achieve almost zero deviation among districts if we ignored all other considerations. But *Kirkpatrick* did not address variances of the small magnitude at issue here when it declared "legally unacceptable" deviations from absolute equality in order to avoid fragmenting political subdivisions. *See* 394 U.S. at 533, 89 S.Ct. at 1230. In granting a stay in *Karcher v. Daggett*, —— U.S. ——, 102 S.Ct. 1298, 1300, 71 L.Ed.2d 635 (1982), Justice Brennan, who wrote for the Court in *Kirkpatrick*, regards as unsettled whether decision-makers may choose among plans of "arguably 'statistically insignificant' variances from the constitutional ideal" on a basis other than numbers alone. In the instant case this Court has been forced into the role of decision-maker. *Kirkpatrick* claims to permit small variances if they are justified. 394 U.S. at 531, 533, 89 S.Ct. at 1229, 1230. We see little merit in pulling 773 voters out of Reno County just to make slightly more equal the number of voters in the First and Fourth districts. That cut would disrupt historical allegiances and increase printing and other election costs. It would make more difficult communication between candidates and these 773 voters, and later communication between the elected representatives and these constituents— to the point that this small number of voters might essentially be ignored. In the words of Justice White, requiring such numeric precision would surely be "sticking at a trifle." *Wells v. Rockefeller*, 394 U.S. 542, 554, 89 S.Ct. 1234, 1241, 22 L.Ed.2d 535 (White, J. dissenting).

The testimony indicated that there are almost surely errors in the census figures, and that the plan we adopt is likely to be in effect for ten years. The population figures are constantly changing; some districts will grow in population faster than others and some may decline in population. The uncertainties of population changes are

compounded by present unemployment rates that are the highest in forty years, declining birth rates, and our country's energy problems. In the light of these realities, we believe that a total population deviation between the highest and lowest district of only 0.338% does no violence to the Constitution's one-person one-vote requirement when, as a trade-off, Kansas will be able to maintain the political integrity of its county units. We therefore adopt the redistricting plan set forth in Appendix A attached hereto, and outline its geography on the map attached as Appendix B.

█ There remains for consideration the Secretary of State's motion for a directed verdict on the plaintiffs' 42 U.S.C. §§ 1981 and 1983 claims. He argues that at the time these suits were filed he had not taken official action to enforce the unconstitutional existing congressional districts. He also states that because he would have brought an action asking us to adopt a new redistricting plan as soon as the legislature had adjourned without adopting a constitutional plan, we should deny the plaintiffs' requests for an award of attorneys' fees and costs under 42 U.S.C. § 1988. We do not agree.

Secretary of State Brier did not personally bring about the unconstitutional districting, but he is the state officer in charge of administering the election laws, and this suit was brought against him in his official capacity. There is nothing extraordinary about holding state officials responsible for successful plaintiffs' attorneys' fees. "Fee awards against enforcement officials are run-of-the-mill occurrences, even though, on occasion, had a state legislature acted or reacted in a different or more timely manner, there would have been no need for a lawsuit or for an injunction." *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 739, 100 S.Ct. 1967, 1978, 64 L.Ed.2d 641 (1980). As stated in *Connor v. Winter*, 519 F.Supp. 1337, 1343–44 (S.D.Miss.1981):

"When bringing a constitutional attack on a state statute, plaintiffs routinely sue the executive officer charged with responsibility for enforcing the legislative policy, even though the executive neither enacted the disputed statute nor possesses the power unilaterally to repeal it. The Election Commission was the only agency with statewide power to prevent the ballot placement of candidates for election to a malapportioned legislature. While they had no power to create reapportionment, they could control the continued election of members to a legislative body found to be unconstitutionally constituted.... That the Board was powerless to effect a legislative reapportionment does not affect its liability for attorney's fees.

"Since these executives were sued in their official capacity, this award of attorney's fees will be paid from the funds of the State government. *Hutto v. Finney*, 437 U.S. 678, 693–94, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522, 535–536 (1978); *McNamara v. Moody*, 606 F.2d 621, 626 (5th Cir. 1979)."

When the O'Sullivan plaintiffs filed suit, there was an obvious deadlock between the Democratic Governor and the Republican majority in the legislature, and only a short time remained before the June 21 final filing date for the congressional elections. Even if the O'Sullivan plaintiffs could have relied upon the Secretary of State to file suit quickly, they could not have known whether he would urge upon us their viewpoint. In fact, the Secretary of State asked that we redistrict in accordance with S. 561, which we have rejected. Because the present districting plan was unconstitutional and no legislative cure was in sight, the O'Sullivan plaintiffs' constitutional rights were imminently threatened by continuation of the existing districts. Thus, we believe this case is within the purview of 42 U.S.C. § 1988. In his official capacity Secretary of State Brier is liable to the O'Sullivan plaintiffs for their reasonable attorneys' fees and expenses. *Cf. Connor*, 519 F.Supp. at 1344–45; *White v. Crowell*, 434 F.Supp. 1119, 1123–24 (W.D.Tenn.1977)

(awarding attorneys' fees in state legislative reapportionment cases).

The Carson plaintiffs are in a somewhat different position because when they filed suit the O'Sullivan suit had already been initiated, and this Court has rejected most of their views. Nevertheless, the Carson plaintiffs have prevailed also, in the sense that they too urged us to adopt a new reapportionment plan, which we did. As noted, they presented the views of a substantial constituency, the Republican legislative majority, and they provided significant assistance to us. We think our discretionary power under section 1988 is broad enough to permit awarding the Carson plaintiffs their reasonable attorneys' fees and expenses. We choose to do so in this case.

All parties are directed to confer and, if possible, to stipulate as to the amount of attorneys' fees and expenses to be recommended to this Court on behalf of both groups of plaintiffs. If no stipulation is made within thirty days, plaintiffs shall present their requests in written form so that this Court may set such fees, following the guidelines set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

IT IS SO ORDERED.

## APPENDIX A

The following counties shall comprise the congressional election districts indicated:

*First District*: Cheyenne, Rawlins, Decatur, Norton, Phillips, Smith, Jewell, Republic, Washington, Marshall, Sherman, Thomas, Sheridan, Graham, Rooks, Osborne, Mitchell, Cloud, Wallace, Logan, Gove, Trego, Ellis, Russell, Lincoln, Ottawa, Greeley, Wichita, Scott, Lane, Ness, Rush, Barton, Ellsworth, Saline, Dickinson, Hamilton, Kearny, Finney, Hodgeman, Pawnee, Stafford, Rice, Stanton, Grant, Haskell, Gray, Ford, Edwards, Kiowa, Pratt, Morton, Stevens, Seward, Meade, Clark, Comanche, Barber.

*Second District*: Nemaha, Brown, Doniphan, Clay, Riley, Geary, Pottawatomie, Jackson, Atchison, Shawnee, Jefferson, Douglas, Leavenworth.

*Third District*: Wyandotte, Johnson, Miami, Linn.

*Fourth District*: Reno, Kingman, Sedgwick, Harper, Sumner.

*Fifth District*: Morris, Wabaunsee, Osage, McPherson, Marion, Chase, Lyon, Coffey, Franklin, Anderson, Harvey, Butler, Greenwood, Woodson, Allen, Bourbon, Elk, Wilson, Neosho, Crawford, Cowley, Chatauaqua, Montgomery, Labette, Cherokee.

## APPENDIX B

Map showing location of congressional district boundary lines adopted by the Court.

