Larry GOOD, et al., Plaintiffs,

v.

Richard H. AUSTIN, Secretary
of State, Defendant.

George Arthur VAN STRATEN,
et al., Plaintiffs,

v.

Richard H. AUSTIN, Secretary
of State, Defendant.

No. 91–CV–74754DT.

United States District Court,
E. and W.D. Michigan.

May 20, 1992.

Theodore Sachs, Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, Detroit, Mich., for Good plaintiffs.

Peter H. Ellsworth, Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, Mich., for Van Straten plaintiffs.

Gary P. Gordon, Asst. Atty. Gen., Lansing, Mich., for defendant Richard H. Austin.

John D. Pirich, Honigman Miller Schwartz & Cohn, Lansing, Mich., for intervenor Representative Dennis M. Hertel.

William J. Perrone, Dykema Gossett, Lansing, Mich., for intervenor Representative Bob Carr.

George Brookover, East Lansing, Mich., for intervenor Senator Carl Levin.

Before RYAN, Circuit Judge, and NEWBLATT and ROBERT HOLMES BELL, District Judges.

## OPINION

For the third consecutive decade, the Michigan Legislature has failed to enact a law apportioning Michigan's congressional districts. That failure has generated these consolidated cases in which two groups of plaintiffs, suing separately, have asked the court to declare the current apportionment of Michigan's congressional districts unconstitutional and to adopt a new districting plan.

On April 6, 1992, we entered a judgment holding that Michigan's current congressional districting violates Article I, Section 2 of the United States Constitution and we adopted a new districting plan of our own design. We entered the judgment without opinion because of the urgency in publicizing the newly adopted districting scheme and we promised that an opinion would follow. We now fulfill that commitment.

We begin by noting that our jurisdiction derives from 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 28 U.S.C. § 2284(a).

## I.

### A.

The 1990 decennial census of the United States revealed that over the course of the last decade there has been a population increase in the State of Michigan from 9,262,078 to 9,295,297. Michigan's population grew at a much slower rate, however, than that of the nation as a whole. As a result, the number of seats in the United States House of Representatives apportioned to Michigan has been reduced from eighteen to sixteen. The 1990 census also revealed that population shifted significantly within the state, with the result that the current congressional districts have substantially unequal population.[1]

The result, for reasons we shall discuss fully, is that the current districting configuration is unconstitutional and new districts must be created. It is elemental, of course, that responsibility for reapportioning Michigan's congressional districts rests first and foremost with the Michigan Legislature. The Supreme Court has noted that " 'reapportionment is primarily a matter for legislative consideration and determination, and … judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' " *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973)

(quoting *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964)).

When it became apparent in the summer of 1991 that there was no movement in the Michigan Legislature toward adoption of a congressional districting law, and indeed acknowledgment by legislative leaders that none was likely, the political parties resorted once again to the federal courts for relief. Two groups of plaintiffs filed separate lawsuits in July and August of 1991, asking federal district courts to declare the current districting unconstitutional, to enjoin the Michigan Secretary of State from conducting congressional elections under the current districting, and to adopt a court-ordered plan. The plaintiffs in both suits also asked for the appointment of a three-judge district court.

One group of plaintiffs (the *Good* plaintiffs), representing the interests of the Democratic Party, filed suit in the United States District Court for the Eastern District of Michigan on July 29, 1991. A second group of plaintiffs (the *Van Straten* plaintiffs), representing the interests of the Republican Party, filed suit a few days later in the United States District Court for the Western District of Michigan. Although both suits name Richard Austin, the Michigan Secretary of State, as defendant, he is a nominal party, and the real adversaries are the two groups of plain-

---

1. The following table illustrates the dramatic changes that occurred in the population of Michigan's current congressional districts from 1980 to 1990.

| District | 1980 | 1990 | Change from 1980–1990 |
|---|---|---|---|
| 1 | 514,560 | 451,018 | − 63,542 |
| 2 | 514,560 | 535,614 | 21,054 |
| 3 | 514,560 | 519,856 | 5,296 |
| 4 | 514,560 | 523,691 | 9,131 |
| 5 | 514,560 | 578,779 | 64,219 |
| 6 | 514,559 | 540,768 | 26,209 |
| 7 | 514,560 | 504,664 | − 9,896 |
| 8 | 514,560 | 490,198 | − 24,362 |
| 9 | 514,560 | 552,808 | 38,248 |
| 10 | 514,560 | 534,840 | 20,280 |
| 11 | 514,560 | 521,569 | 7,009 |
| 12 | 514,560 | 534,813 | 20,253 |
| 13 | 514,560 | 402,387 | −112,173 |
| 14 | 514,559 | 501,103 | − 13,456 |
| 15 | 514,560 | 507,560 | − 7,000 |
| 16 | 514,560 | 494,340 | − 20,220 |
| 17 | 514,560 | 489,686 | − 24,874 |
| 18 | 514,560 | 609,856 | 95,296 |

tiffs, surrogates respectively for the Democratic and Republican parties.

In an order issued on August 30, 1991, the chief judge of the United States Court of Appeals for the Sixth Circuit convened this three-judge court under 28 U.S.C. § 2284(b).

Mindful of the legislators' primary authority in matters of congressional districting, we deferred acting in these cases for several months. Like its predecessors in 1972 and 1982, however, the current legislature has failed to adopt a redistricting plan.[2]

### B.

In October 1991, we entered a scheduling order establishing a timetable for the filing of briefs, the completion of discovery, the submission of proposed redistricting plans by the parties, and the commencement of evidentiary hearings.

Each group of plaintiffs was permitted to submit one districting plan to be filed no later than January 31, 1992. In the meantime, the court granted motions to intervene filed by Congressmen Bob Carr, Dennis Hertel, and Sander Levin, and denied a motion to intervene filed by State Senator David Honigman. The court limited the scope of the intervenors' participation to commenting upon and offering suggestions for modification of the submitted plans. Intervenors were not permitted to file plans of their own.

Early in the course of the proceedings, the members of the court panel recognized that the court would require the assistance of an expert to analyze and evaluate the plans submitted by the parties, particularly with respect to whether the plans complied with the constitutional, statutory, and secondary criteria established by the United States Supreme Court for judicial approval of congressional districting schemes. We recognized too that in the event the plans submitted by the parties proved to be un-

satisfactory, the court would have to be prepared to adopt a plan of its own design. We immediately began an extensive search for a qualified person to assist the court in those tasks. We reviewed the credentials of a number of experts in the fields of cartography and demography, and in the specific field, such as it is, of computer-based legislative districting. Happily, and perhaps not surprisingly, we found a superbly qualified person here in Michigan. He is Eric Swanson, Director of the Michigan Information Center for the Michigan Department of Management and Budget. Mr. Swanson is a skilled geographic information systems specialist with substantial expertise in state legislative redistricting matters.

We entered an order, pursuant to Fed. R.Evid. 706, appointing Mr. Swanson to serve as the court's expert. We then instructed Mr. Swanson to analyze the districting plans submitted by the parties and determine whether, and to what extent, they conformed to certain constitutional, statutory, and secondary criteria that we described to him and that we shall identify and discuss hereafter. We further instructed him to begin immediately to design a redistricting plan for the court in conformance with those same criteria.

### C.

Evidentiary hearings on the parties' proposed plans began on March 9, 1992. During five days of hearings, the court heard the testimony of two congressmen, the drafters of the parties' respective plans, and various expert and nonexpert witnesses. In addition, the deposition testimony of Congressmen Carr and Hertel was received.

After carefully considering the proofs offered by the parties, we entered an opinion and order on March 23, 1992, holding that Michigan's existing congressional districts violate Article I, Section 2 of the United

---

**2.** The Michigan Legislature last enacted a congressional redistricting plan in 1964. *See* 1964 Mich.Pub. Acts 282, codified at Mich.Comp. Laws Ann. § 3.51 (West 1981). Michigan's last two congressional redistricting plans were adopted by federal courts. *See Agerstrand v. Austin,* No. 81–50256, slip op. at 13–14 (E.D.Mich. May 20, 1982); *Dunnell v. Austin,* 344 F.Supp. 210 (E.D.Mich.1972).

States Constitution because they contain substantially unequal population. We declined, however, to adopt either of the redistricting plans proposed by the parties and announced our intention to adopt a plan of our own. We attached our proposed plan to the order and directed the parties to show cause in writing within eight days why the court's plan should not be adopted and incorporated in a final judgment.

The Van Straten plaintiffs and Congressmen Hertel filed responses to the show cause order but expressed no objections to the court's plan. The remaining parties did not respond to the order. We entered a final judgment on April 6, 1992, adopting the plan with one minor modification.

We shall now explain the factual and legal bases for our decision to reject the districting plans prepared by the parties and to adopt a plan of our own design. We shall also discuss the criteria we employed in designing the plan and explain why we used those criteria and not others.

## II.

We begin our analysis with a restatement of the findings of our first opinion in this matter. In that opinion we held that Michigan's current congressional district plan is unconstitutional under the "one person, one vote" principle enunciated by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964), and *Reynolds v. Sims*, 377 U.S. 533, 565–66, 84 S.Ct. 1362, 1383–84, 12 L.Ed.2d 506 (1964). In *Wesberry*, the Court defined this standard as it applies to United States congressional districts, holding that congressional districts must be constructed so that "as nearly as is practicable one man's vote in a congressional election is ... worth as much as another's." 376 U.S. at 8, 84 S.Ct. at 530.

Over time, the Supreme Court has refined the "nearly as is practicable" standard of *Wesberry*. In *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969) (citation

omitted), the Court held that this standard requires a "good faith effort to achieve precise mathematical equality. Unless population variances are shown to have resulted despite such effort, the State must justify each variance, no matter how small." In its most recent analysis of the issue, *Karcher v. Daggett*, 462 U.S. 725, 732, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983), the Court reaffirmed its dedication to the principle of exact mathematical equality and rejected the argument of the State of New Jersey that variations in population that are smaller than the margin of error embodied in the census figures should be regarded a *de minimis*. These cases make it clear that for any deviation from mathematical equality to pass constitutional muster, it must be demonstrated that the deviation either was unavoidable despite good faith efforts to avoid it or was justified by a legitimate state interest.

No one disputes that Michigan's current congressional districts contain substantially unequal population according to the 1990 census figures,[3] and no one has attempted to justify the population deviations of the current districts. We held therefore that those districts violate Article I, Section 2 of the Constitution.

In addition to stating our finding that Michigan's existing districts are unconstitutional, our first opinion contained an evaluation of the plans submitted by the parties. We began by noting that any plan that is adopted must satisfy three different levels of criteria. The first and foremost criterion is the constitutional requirement of precise mathematical equality of population in each district. *Karcher v. Daggett*, 462 U.S. 725, 732, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983). Second, the plan must comply with the requirements of the Voting Rights Act. 42 U.S.C. §§ 1973 and 1973c. Finally, the plan must properly balance a wide array of secondary or equitable criteria. Federal courts have recognized the following as relevant secondary criteria in congressional district map drawing: compactness, contiguity, preservation of the integrity of county and municipal boundaries,

---

**3.** *See* note 1 *supra*.

maintenance of the cores of existing districts, preservation of cultural, social, and economic communities of interest, and political and racial fairness. *See, e.g., Agerstrand v. Austin,* No. 81–40256, slip op. at 7–8 (E.D.Mich. May 20, 1982); *O'Sullivan v. Brier,* 540 F.Supp. 1200, 1203 (D.Kan. 1982).

After identifying these criteria, we evaluated the parties' respective plans and reached the following conclusions:

1. Both plans satisfied the constitutional requirement of population equality. In Michigan in 1992, this criterion requires that fifteen districts have a population of 580,956 persons and one district have a population of 580,957 persons. Both plans met these population requirements.

2. Both plans also complied with the mandates of Sections 2 and 5 of the Voting Rights Act. 42 U.S.C. § 1973 and 1973c. As those sections apply to Michigan's congressional districts, they require essentially that the implementation of a congressional redistricting plan may not result in "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). Under this standard, a redistricting plan must, to the extent mathematically and demographically possible, retain the same number of districts with a majority of minority citizens and voters as exist in the current district plan. The retained districts must have an adequate but not excessive majority of minority citizens or voters to assure them a reasonable opportunity to elect their representative of choice. *See United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977). Although federal courts have noted that the exact percentage of minority voters necessary to meet this standard depends on the facts of the case, they have observed that districts with approximately 65% minority population will generally satisfy this standard. *Id.; Ketchum v. Byrne,* 740 F.2d 1398, 1412–17 (7th Cir.

1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *Rybicki v. State Board of Elections,* 574 F.Supp. 1147, 1149 (N.D.Ill.1983).

Michigan's current congressional districts include two districts in the Detroit area with a majority of black citizens and voters: the 1st and the 13th. The plans submitted by both parties retained those two districts essentially intact, with a sufficient majority of black citizens and voters to satisfy the principle of no retrogression. Therefore, the parties stipulated and the court found that both plans satisfied the requirements of the Voting Rights Act. 42 U.S.C. §§ 1973 and 1973c.

3. Although both parties' plans conformed with the relevant statutory and constitutional requirements, we declined to adopt either of them because they failed to balance properly the secondary or equitable criteria. To repeat, those criteria are: 1) contiguity, 2) compactness, 3) retention of the geographic and population cores of existing districts, 4) preservation of the integrity of county and municipal boundaries, 5) maintenance of cultural, social, and economic communities of interests, 6) political fairness, and 7) racial fairness.

We observed in our first opinion that both the Van Straten plan and the Good plan assigned primary importance to the secondary criterion of "political fairness" and did so at the expense of other equitable criteria. Virtually all of the proof adduced at the evidentiary hearings concerned the asserted political fairness of the parties' respective plans. Both groups of plaintiffs called experts to extoll the fairness of their sponsor's plan while denigrating the opponent's plan as a gross and unfair gerrymander.

The Good plaintiffs' expert, Dr. Allan Lichtman, concluded that the Van Straten plan was unfair for a number of reasons. He noted first that it pitted two pairs of Democratic incumbents against each other, thus assuring the loss of two Democratic incumbents, while the Good plan pitted one pair of Republican incumbents and one pair

of Democratic incumbents, thus sharing the loss of incumbents between the two parties. He concluded, second, that the Van Straten plan treated unfairly the Democratic incumbents in the current 3rd, 6th, and 12th congressional districts, by eroding the present population bases of those districts and altering their underlying partisan structure in a way that favored Republicans. Finally, he observed that the Van Straten plan unfairly "packed" Democratic-leaning voters into certain districts and fragmented other concentrations of Democratic-leaning voters into multiple districts, with the effect of diluting Democratic voting strength.

Dr. Lichtman reached these conclusions on the basis of an extensive statistical analysis of the underlying partisan preferences of Michigan voters. In general, he testified that Michigan voters are roughly evenly divided between those favoring Republicans and those favoring Democrats. To determine whether the parties' plans packed or fragmented partisan support in any proposed districts, he examined the results of several statewide elections for the state Board of Education and used them as a "base line" to determine the partisan makeup of each district in each of the proposed plans. He explained that he used state Board of Education election results because the partisan division of votes in those elections was least likely to be influenced by controversial issues or high profile "glamour" candidates, resulting therefore in a "truer" indication of the voters' straight party preference. On the basis of this analysis, he concluded that the Van Straten plan packed and fragmented Democratic voters, while the Good plan did not treat Republican voters similarly.

The Van Straten plaintiffs' expert, Dr. Gary King, agreed that Michigan's voters are roughly evenly divided between Republicans and Democrats. In his opinion, however, the partisan preference of voters in congressional elections could not reliably be determined based exclusively on an analysis of the results of noncongressional elections. He testified that to determine the partisan preference of voters with respect to the particular office of Representative to Congress, one must study the results of past congressional elections. Dr. King therefore used the results of past congressional elections as well as a host of other factors to test the respective plans for what he characterized as "partisan symmetry." Under the partisan symmetry test, a plan is evaluated to determine whether it will allow each party to translate the same percentage of overall votes across the state into the same number of congressional seats. According to Dr. King, if both parties can translate votes into seats in the same proportion, the plan achieves partisan symmetry and is politically fair. For example, if under a proposed plan one party could win 75% of the seats with 55% of the overall vote, the plan would be fair only if the other party could also win 75% of the seats with 55% of the overall vote. Applying this analysis to both the Van Straten and Good plans, Dr. King concluded that the Good plan was biased in favor of the Democrats and therefore politically unfair, while the Van Straten plan was not biased and therefore fair.

After careful study of the Good and Van Straten plans, examination of the voluminous exhibits, and consideration of the expert and nonexpert testimony, we concluded that neither of the plans proposed by the parties was acceptable. We found that both plans were designed to advantage the political parties on whose behalf they were drafted and submitted. Not surprisingly, both plans, to a substantial degree, gerrymandered district lines not only to achieve partisan advantage but, in a number of instances, to accommodate and advantage incumbent congressmen. We further recognized that although these purposes are not of themselves illegal or necessarily inequitable, they proved to be unacceptable in the parties' plans because the resultant partisan and incumbent advantages were achieved at the expense of geographical compactness and preservation of the integrity of county, city, and township lines. We concluded that the nonpolitical criteria of compactness and breaking as few county, city, and township lines as reasonably possible served important nonpartisan in-

terests of the citizens of the State of Michigan, and that both parties' efforts to achieve political advantages in the name of "political fairness" sacrificed those interests unnecessarily and inequitably.[4] We declined therefore to adopt either of the plans proposed by the parties. We decided, instead, to adopt a plan of our own design. We turn now to a description of that plan.

### III.

We begin by noting that this litigation does not involve a challenge to a redistricting plan adopted by the Michigan Legislature. Indeed, neither house of the legislature was able to develop a plan. In that respect, we are not interjected into the "political thicket" as the *Agerstrand* court was ten years ago when it was asked at the eleventh hour to adopt a proposed plan that had been approved by both houses of the legislature but vetoed by the governor. We start from scratch. We are required to adopt a congressional districting plan that is entirely the product of judicial action.

From the time it became apparent that we would reject the plans submitted by the parties, we have understood our duty to require us to adopt a districting map that is entirely the court's conception and therefore totally free, in its design, of partisan political considerations.

We began by advising Mr. Swanson to gather the data and to assemble the computer software necessary to construct a new districting plan. We instructed him to design a plan based upon the certified 1990 census data that would produce fifteen congressional districts of 580,956 people each, and one district of 580,957. We directed that the plan be constructed entirely without regard to potential effect upon political parties and incumbent members of Congress or to political consequences of any kind.

Our order to Mr. Swanson was to devise a plan in conformance with the following criteria and none other, and in the following order of priority:

*Constitutional Criteria:*
    Precise mathematical equality of population in each district.

*Statutory Criteria:*
    The requirements of the 1982 amendments to section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

*Secondary Criteria:*
    Contiguity
    Compactness
    Breaking as few county, city, and township boundaries as is reasonably possible.
    Preservation to the extent reasonably possible of the unity of established regional cultural and economic interests.

In selecting these criteria, we were guided by several considerations. The constitutional and statutory criteria are mandated by law. We decided on the particular secondary criteria because they serve important nonpartisan interests shared by all of the citizens of the State of Michigan. In addition to serving as a check on gerrymandering, compactness "facilitates political organization, electoral campaigning, and constituent representation." *Karcher v. Daggett,* 462 U.S. 725, 756, 103 S.Ct. 2653, 2673, 77 L.Ed.2d 133 (1983) (Stevens, J. concurring) (footnote omitted). Similarly, avoiding the unnecessary division of counties, cities, and townships into two or more districts serves several important nonpartisan interests:

Subdivision boundaries tend to remain stable over time. Residents of political units such as townships, cities, and counties often develop a community of interest, particularly when the subdivision plays an important role in the provision of governmental services. In addition, legislative districts that do not cross subdivision boundaries are administratively convenient and less likely to confuse the voters.

---

**4.** Such a comment is not intended to disparage either the parties or their counsel. As to counsel, they could not have acted more professionally or ethically. Moreover, they performed under the extraordinary pressure of meeting the rigid and limited time constraints imposed by this court and the Michigan courts in the redistricting of the state legislative and senatorial districts.

*Id.* at 758, 103 S.Ct. at 2674 (footnote omitted). Finally, the preservation of regional communities of interest within a single district enhances the ability of constituents with similar regional interests to obtain effective representation of those interests.

We decided not to include in our instructions to Mr. Swanson other secondary criteria such as "political and racial fairness" and the preservation of "population and geographic core areas." Five days of hearings confirmed that the application of those criteria have, and are intended to have, direct political consequences. For example, the parties' experts convinced us that the concepts of political and racial fairness are often nothing more than political euphemisms used to mask gross gerrymandering. Similarly, the maintenance of the geographic and population cores of existing districts is a criterion designed primarily to protect incumbents. Criteria that are so laden with political considerations are inappropriate, in our judgment, in the formulation of a judicial districting plan. They were not included, therefore, in our instructions to our plan designer.

In due course, Mr. Swanson produced a districting plan and submitted it to the court for consideration. We reviewed the plan, first of all, for its compliance with the constitutional and statutory criteria. Then we compared it to the current districting map and the plans proposed by the plaintiffs. The court's new plan creates fifteen districts with a population of 580,956 each and one district with a population of 580,-957, thus complying with the constitutional requirement of population equality. The plan also preserves two districts in the Detroit area with a sufficient majority of black voters to comply with the mandates of the Voting Rights Act.[5]

We next evaluated the plan for compliance with the secondary criteria of contiguity, compactness, and preservation of the integrity of the boundaries of political subdivisions. We note first that the court's plan creates no districts with discontiguous parts. Our assessment of the plan's compliance with the remaining secondary criteria included comparison of the court's plan first with the parties' proposed plans and then with Michigan's existing plan. This comparative analysis revealed that the court's plan produced congressional districts that were significantly more compact and divided fewer counties, cities, and townships than either of the parties' proposed plans or Michigan's existing districts.

To evaluate the compactness of the court's plan, we compared it to the existing districts and the parties' plans, using two different methods for measuring compactness. The first, known as the circumscribing circle test, measures the ratio of the area of a district to the area of the smallest possible circle that can circumscribe the district. The second, known as the perimeter circle test, measures the ratio of the area of a district to the area of a circle, the

**5.** The following table profiles the demographic composition of the districts in the court's plan. VAP means voting age population.

| Dist. | Total Population | Total VAP | Total Black | % Black | VAP Black | % VAP Black |
|---|---|---|---|---|---|---|
| 1 | 580,956 | 431,643 | 4,909 | 0.84% | 4,397 | 1.01% |
| 2 | 580,956 | 414,968 | 25,324 | 4.35% | 16,441 | 3.96% |
| 3 | 580,956 | 416,628 | 43,356 | 7.46% | 27,864 | 6.68% |
| 4 | 580,956 | 425,655 | 6,182 | 1.06% | 4,622 | 1.08% |
| 5 | 580,956 | 418,962 | 48,758 | 8.39% | 30,136 | 7.19% |
| 6 | 580,956 | 426,902 | 55,474 | 9.54% | 34,626 | 8.11% |
| 7 | 580,957 | 424,301 | 32,742 | 5.63% | 23,172 | 5.46% |
| 8 | 580,956 | 431,535 | 33,900 | 5.83% | 22,744 | 5.27% |
| 9 | 580,956 | 420,886 | 103,133 | 17.75% | 66,278 | 15.74% |
| 10 | 580,956 | 434,093 | 11,755 | 2.02% | 7,909 | 1.82% |
| 11 | 580,956 | 444,245 | 23,967 | 4.12% | 17,240 | 3.88% |
| 12 | 580,956 | 442,863 | 21,717 | 3.73% | 15,446 | 3.48% |
| 13 | 580,956 | 442,445 | 64,052 | 11.02% | 44,199 | 9.99% |
| 14 | 580,956 | 408,963 | 401,444 | 69.10% | 266,913 | 65.26% |
| 15 | 580,956 | 418,224 | 406,905 | 70.04% | 285,053 | 68.15% |
| 16 | 580,956 | 434,219 | 8,088 | 1.39% | 5,435 | 1.25% |

perimeter of which is the same as the perimeter of the district. Under both tests, the closer the ratio is to the number one, the more compact the district. The circumscribing circle test is particularly sensitive to the degree of elongation of a district's configuration, while the perimeter circle test is sensitive to indentations in the design. We measured each district in all four plans by both of these tests, and for the purpose of a general comparison, calculated the average compactness of all the districts of a given plan. The table below indicates the average compactness of districts for each of the plans under each of the tests. The higher the number, the greater the compactness, on average. Stated differently, the closer to one, the more compact the plan.

|  | Current Districting | Van Straten | Good | Court |
|---|---|---|---|---|
| Circumscribing Circle Test | .39 | .38 | .36 | .47 |
| Perimeter | .34 | .36 | .35 | .44 |

Thus, the court's plan creates districts, on average, significantly more compact than the current districts or the districts as constructed in the parties' suggested plans.

We then analyzed Mr. Swanson's map for compliance with our instructions that the reconstructed districts should not break county, city, and township lines more frequently than is necessary to comply with the overriding criteria of population equality and compliance with the Voting Rights Act, and with the criterion of compactness. Again, our analysis included a comparison to the current districts and to the parties' proposed plans.

The following table indicates the number of political units "broken," and the total number of times such units are broken, by the current districting plan, the Van Straten plan, the Good plan, and this court's plan.

|  | Current Districting | Van Straten | Good | Court |
|---|---|---|---|---|
| Number of Counties Broken | 29 | 15 | 24 | 11 |
| Total County Breaks | 70 | 36 | 59 | 30 |
| Number of Cities and Townships Broken | 17 | 16 | 16 | 15 |
| Total City and Township Breaks | 37 | 32 | 33 | 31 |

In every respect, the court's plan breaks fewer political subdivision lines than are broken in the current congressional districts or in the plans proposed by the parties.[6]

We recognize that despite Mr. Swanson's strict application of the nonpartisan, apolitical criteria we instructed him to employ, the resulting reconstructed congressional districts necessarily have some political consequences. For example, the reduction in Michigan's congressional delegation from eighteen to sixteen produces one such consequence. It necessitates, in two instances, the combination of significant portions of two old districts into one new district. In designing their respective plans, the parties selected which districts to combine, at least in part, on political considerations. Our instructions to Mr. Swanson, however, were to combine districts, where necessary, without regard to political consequences. The resulting combinations in the court's plan were determined by population requirements, the mandates of the Voting Rights Act, and considerations of geographical compactness. For example, the plan combines significant portions of the old 14th and 17th districts into the new 12th district. Several objective factors contributed to this result. The Voting Rights Act required the retention of two minority districts in the Detroit area. Those districts, however, lost substantial population over the last decade. To retain those districts essentially intact, and at the same time meet the population requirement of 580,956 people, it was necessary to absorb a significant amount of population from the surrounding districts. Most of this population was taken from the old 14th and 17th districts because they were the most geographically convenient districts for this purpose. Once the population of these two districts had been depleted in order to comply with the requirements of the Voting Rights Act, neither district retained sufficient population to meet the constitutional requirement of equality of population. Compliance with that criterion as well as the secondary criterion of compactness resulted in the combination of the remainders of these districts into one new district.

It was also apparent that a districting map devised entirely according to nonpolitical criteria could inadvertently result in a plan that unfairly favored one political party over the other. We decided, therefore, to evaluate the probable political effects of the newly constructed districts by applying the tests for "political fairness" proposed by the parties' experts who testified at the hearing. We have described earlier in this opinion what those tests are.

All of the parties agreed that Michigan is approximately evenly divided between voters who favor Democrats and those who favor Republicans. Although the two tests for "political fairness" advocated by the parties' experts differ in methodology and substance, both tests, according to their proponents, should predict with reasonable accuracy the approximate allocation of seats to Republicans and Democrats in the next congressional election. We instructed Mr. Swanson to test the political fairness of the plan he produced for the court first, according to the "base line Board of Education test" favored by the Good/Democrat plaintiffs and then the "partisan symmetry" test advocated by the Van Straten/Republican plaintiffs, and to report the results to the panel. Mr. Swanson concluded, and the members of the panel have since independently verified, that the court's plan, measured for political fairness according to the standards suggested by both parties, is likely to result in a congressional delegation in 1992 that is roughly proportionate to the relative strength of the political parties in the State of Michigan; that is to say approximately 50/50. Certainly no one can predict the probable outcome of

---

6. We acknowledge that the court's plan is by no means perfect. Barry County in southwestern Michigan, for example, is divided into three districts. The division of counties and townships into multiple districts is regrettable, but it is an unavoidable consequence of the constitutional requirement of precise mathematical equality of population in each district. To achieve such precise equality, some counties, cities, and townships had to be divided. The court strove to keep such divisions to a minimum and yet make the districts as compact as possible. In the case of Barry County, its division into three districts was necessary to achieve precise mathematical equality in the districts in that area and to maintain the relative compactness of those districts.

congressional elections to be held months from now in Michigan's newly constructed congressional districts, and we do not pretend to be capable of doing so. We are able to say only that, measured against the methodologies for testing political fairness proposed by the contesting parties, there is no indication that the court's plan favors or disfavors, inadvertently or otherwise, either political party or their candidates. Perhaps the best indication of that is that neither group of plaintiffs nor the intervenors have registered any objection to the court's plan or even suggested any modification to it, despite being invited to do so.

Finally, we have renumbered the districts in the new map in a more logical sequence. The old numbering, which saw the 1st district adjoining the 13th, was the residue of several decades of court-ordered changes in the number and location of districts.

### IV.

The parties in this case invoked the court's equitable power to adopt a new congressional districting plan for the State of Michigan. In the absence of state legislative action in this regard, we were obliged to adopt a plan that not only complied with the mandatory constitutional and statutory criteria but also properly balanced the relevant secondary criteria in a way that advanced the collective interests of the citizens of the State of Michigan. Those interests include primarily the creation of compact, regular, and administratively convenient districts. The plans proposed by the parties sacrificed these goals for the sake of advancing the political interests of a particular group of Michigan's citizens. We therefore declined to adopt their plans and adopted instead a plan of our own design. That plan was developed without regard to political considerations and with the express purpose of achieving maximum compactness while breaking as few county, city, and township boundaries as possible. It accomplishes those goals without resulting in any inadvertent political unfairness and with faithful adherence to the judicial standards of impartial and

principled decision making that is required of a court of equity.

The parties and intervenors will bear their own costs, this having been a profoundly important public question.

Costs of the court's appointed expert will be borne by the parties and intervenors in proportional amounts to be determined hereafter.