Al VERA, Edward Chen, Pauline Orcutt, Edward Blum, Kenneth Powers and Barbara L. Thomas, Plaintiffs,

v.

George W. BUSH, in his official capacity as Governor of the State of Texas, Bob Bullock, in his official capacity as Lt. Governor and President of the Texas Senate, Dan Morales, in his official capacity as Attorney General for the State of Texas, Pete Laney, in his official capacity as Speaker of the House of Representatives, and Antonio Garza, in his official capacity as Secretary of State of the State of Texas, Defendants.

Civil Action No. H–94–0277.

United States District Court, S.D. Texas, Houston Division.

Aug. 6, 1996.

Paul Loy Hurd, Monroe, LA, Ted Hirtz, Houston, TX, for Plaintiffs.

Richard E. Gray, III, Gray & Becker, Austin, TX, Javier Aguilar, Austin, TX, Deborah Anne Verbil, Office of Attorney General, Austin, TX, for Defendants George Bush, Dan Morales, Bob Bullock, Antonio Garza and Pete Laney.

Robert A. Kengle, Steven H. Rosenbaum and Gaye L. Hume, U.S. Department of Justice, Washington, DC, Nancy Herrera, U.S. Attorney's Office, Houston, Texas, for U.S., Defendant–Intervenor.

Elaine Jones and Penda Hair, NAACP Legal Defense & Education Fund, Inc.,

Washington, DC, for Defendants–Intervenors William Lawson, et al.

Judith A. Sanders–Castro, Mexican–American Legal Defense & Education Fund, San Antonio, TX, for Defendants–Intervenors LULAC and Robert Reyes, et al.

Luis Wilmot and Alabert H. Kauffman, Mexican–American Legal Defense & Education Fund, San Antonio, TX, for Defendants–Intervenors MALDEF.

J. Gerald Herbert, Alexandria, VA, for Amicus Eddie Bernice Johnson.

Keith P. Ellison, Houston, TX, for Amici Sheila Jackson Lee and Gene Green.

Before JONES, Circuit Judge and HITTNER and HARMON, District Judges.

## MEMORANDUM OPINION ON INTERIM REMEDY

Pending before the Court are Plaintiffs' Motion for Remedy filed shortly after the Supreme Court's affirmance of this Court's judgment in *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and the Motion of Defendants Lieutenant Governor Bullock ("Bullock") and Speaker of the Texas House Laney ("Laney") to Stay Imposition of a Court–Ordered Remedy. Governor Bush, together with the Secretary of State Garza and Attorney General Morales (hereafter collectively referred to as "the Governor"), take no position on the propriety of a Court-ordered remedy but have assisted the Court in its decisionmaking process. The Court has considered voluminous pleadings and affidavits submitted by all parties and by various *amici curiae* and has heard arguments of counsel and testimony at hearings conducted July 11, July 22 and July 31, 1996. Having done so, the Court has decided for the reasons stated below that an interim Court-ordered redistricting plan is mandatory in this case.

The Court has redrawn the boundaries for congressional districts 18, 29 and 30, as well as portions of districts 7, 8, 9, 22, 25, 3, 5, 6, 24 and 26. Under the Court's interim plan, voters in the 13 affected congressional districts will participate in an open primary conducted along with the 1996 presidential elections. All qualified candidates will compete in the primary, which will follow Texas's special election law insofar as possible. If necessary, runoff elections will be held December 10, 1996. The legislature is directed to fashion a constitutional apportionment scheme during its 1997 session. The attached order formally describes the new districts; the Appendix attached hereto includes maps of the interim districts; and the Exhibits contain information on population deviation, split precincts, and a bill description of the court-ordered districts.

In its original opinion, the Court found that congressional districts 18, 29 and 30 were created as the product of overt racial gerrymandering rather than as a response to legitimate political districting concerns or the requirements of the Voting Rights Act. This Court found, for instance, that in each of these districts, the state utilized a computer program that revealed the race of inhabitants in census tracts on a block-by-block basis and used those data either to include or exclude whites, African–Americans and Hispanics from the challenged districts and those adjoining them. The Supreme Court also recognized the intricacy of the state's racial reapportionment, emphasizing that "[t]he availability and use of block-by-block racial data was unprecedented; before the 1990 census, data were not broken down beyond the census tract level. By providing uniquely detailed racial data, REDAPPL, [the state's computer program], enabled districters to make more intricate refinements on the basis of race than on the basis of other demographic information." *Bush v. Vera,* —— U.S. ——, ——, 116 S.Ct. 1941, 1953, 135 L.Ed.2d 248 (1996).

The result of this racial gerrymandering was the creation of congressional districts whose boundaries follow no conceivable standards of traditional districting criterion such as compactness, contiguity, or community or natural boundaries. The Supreme Court agreed that the districts were radically unconventional and observed that in these bizarre, contorted districts,

> [i]n numerous instances, the correlation between race and district boundaries is nearly perfect.... The borders of Dis-

tricts 18, 29, and 30 change from block to block, from one side of the street to the other, and traverse streets, bodies of water, and commercially developed areas in seemingly arbitrary fashion until one realizes that those corridors connect minority populations.

*Vera,* —— U.S. at ——, 116 S.Ct. at 1953 (*quoting Vera v. Richards,* 861 F.Supp. 1304, 1334 (S.D.Tex.1994)). Indeed, the pattern behind the seemingly illogical boundaries became evident once the clarity and detail of the state's racial information and input were exposed.

Evidence of confusion among voters and candidates attempting to campaign in these districts was graphic and abundant.[1] These congressional districts had been shaped, in short, for the benefit of preferred candidates. But this perversion both of race and of representative government did not escape the attention of either this Court or of the Supreme Court, which reiterated that

> [a]s enacted in Texas in 1991, many incumbent protection boundaries sabotaged traditional redistricting principles as they routinely divided counties, cities, neighborhoods, and regions. For the sake of maintaining or winning seats in the House of Representatives, Congressmen or would-be Congressmen shed hostile groups and potential opponents by fencing them out of their districts. The Legislature obligingly carved out districts of apparent supporters of incumbents, as suggested by the incumbents, and then added appendages to connect their residences to those districts. *The final result seems not one in which the people select their representatives, but in which the representatives have selected the people.*

*Vera,* —— U.S. at ——, 116 S.Ct. at 1954 (*quoting Vera v. Richards,* 861 F.Supp. 1304, 1334 (S.D.Tex.1994) (citations and footnotes omitted)) (emphasis added). The flagrant and pervasive use of the race of Texan voters in the state's gerrymander gave this Court

obvious and "ample bases on which to conclude both that racially motivated gerrymandering had a qualitatively greater influence on the drawing of district lines than politically motivated gerrymandering, and that political gerrymandering was accomplished in large part by the use of race as a proxy." *Vera,* —— U.S. at ——, 116 S.Ct. at 1956.

On appeal, the Supreme Court agreed with this Court's analysis of the evidence and our ultimate conclusion that the districts were unconstitutional. The Supreme Court "found that all three districts are bizarrely shaped and far from compact, and that *those characteristics are predominantly attributable to gerrymandering that was racially motivated and/or achieved by the use of race as a proxy.*" *Id.* at ——, 116 S.Ct. at 1961 (emphasis added). Subjecting these contorted districts to strict constitutional scrutiny, the Court reasoned that the districts did not pass muster, for the "characteristics [of the districts] defeat any claim that the districts are narrowly tailored to serve the State's interest in avoiding liability under § 2 [of the Voting Rights Act], because § 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Id.* at ——, 116 S.Ct. at 1961 (citation omitted). Put differently, the Voting Rights Act neither compelled nor tolerated the state's unconstitutional racial gerrymander:

> If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district; if a reasonably compact district can be created, nothing in § 2 requires the race-based creation of a district that is far from compact.... [Rather,] [s]ignificant deviations from traditional districting principles such as the bizarre shape and non-compactness demonstrated by the districts here, cause constitutional harm insofar as they convey the message that political identity is, or should be predominantly racial.... The districts ... exhibit a level

---

1. *See, e.g.,* Affidavits of Edward Blum (declaring that he "found massive voter confusion with regard to voters being unable to identify the correct district in which they resided. This confusion was greatly compounded because their neighbors were in different congressional districts."); Kenneth Michael Powers (explaining that "[t]here was much confusion on the part of campaign headquarters' staff, as well as voters, as to which congressional district a voter resided.")

of racial manipulation that exceeds what § 2 could justify.

*Id.* at ——–——, 116 S.Ct. at 1961–62. As the Supreme Court reminded, because traditional districting practices "which acknowledge voters as more than mere racial statistics, play an important role in defining the political identity of the American voter. [The] Fourteenth Amendment jurisprudence evinces a commitment to eliminate unnecessary and excessive governmental use and reinforcement of racial stereotypes." *Id.* at ——, 116 S.Ct. at 1964 (citations omitted).

To recap briefly the litigation underlying the Supreme Court's opinion, the plaintiffs' lawsuit was filed in January, 1994, shortly before Texas's primary election season. This Court tried the case and rendered its judgment in September, 1994, determining that Texas's district boundaries had been racially gerrymandered in violation of the constitution. This Court did not, however, stay the 1994 congressional elections, based on the likelihood that defendants would appeal to the Supreme Court, that the Court would take some time considering the appeal in this novel area of law, and that there was no practicable opportunity for the state of Texas to respond to this Court's judgment before the November, 1994 elections. Although the Court's order stayed the 1996 elections, that order was itself stayed by the Supreme Court.

The Texas legislature convened in regularly scheduled session in 1995 and held hearings on possible redistricting of these three congressional districts in March and April. Testimony was received in Dallas and Houston, but the legislature declined to redistrict in response to this Court's judgment.[2]

The Supreme Court's decision affirming this Court's judgment was rendered June 13, 1996, and the Supreme Court issued an immediately effective order. When this Court's first remedial hearing was held on July 11, counsel for the Governor, Javier Aguilar, represented that Governor Bush had definitely decided not to call a special session of the legislature to attempt redistricting in time to affect the November, 1996 elections. Similarly, counsel for the Lieutenant Governor and Speaker of the House, Richard E. Gray, confirmed that the legislators were uninterested in and would be inconvenienced by the holding of a special session during this summer because they are in the midst of campaign preparation.

Faced with the refusal of senior state officials to exercise their responsibilities to redistrict, the inability of the parties to settle with agreed-upon boundaries for congressional districts,[3] and the continued gross unconstitutionality of the district lines, this Court had to determine whether to order an interim districting plan or to permit the 1996 congressional elections to proceed under the current, albeit unconstitutional districting scheme for yet another election cycle. The Court's decision has been instructed by the applicable Supreme Court standards concerning the issuance of Court-ordered districting plans and has been shaped by the extreme facts of this case urging a prompt constitutional remedy.

## A. Legal Standards

The basic framework for determining the propriety of Court-ordered districting relief was articulated in *Reynolds v. Sims,* 377 U.S.

2. *See also,* Affidavit of State Representative Kent Grusendorf (explaining that "the Committees [on Redistricting] have affirmatively decided not to take up and pass a new congressional districting plan. During the 1995 Session of the Texas Legislature, some in the legislature proposed adopting a contingent redistricting plan to take effect when the Supreme Court decision, expected to affirm the District Court decision in *Vera,* was handed down. However, the leadership in the legislature opposed such a plan."); Affidavit of State Representative John Culberson (acknowledging that "those familiar with redistricting in the legislature were reasonably confident that this Court's opinion would be affirmed. The

legislature should have exercised its own independent judgment and corrected these errors during the 1995 Session [but] [t]he Texas legislature has failed to remedy these unconstitutional districts...."); Affidavit of State Representative Jerry Madden (same).

3. *See, e.g.,* Bullock's and Laney's Report Regarding Settlement Discussions at 1 (admitting that "the parties to this case have reached no agreement. The parties differ widely on the scope of the required remedy ... and about how any such remedy should be implemented.").

533, 585, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964) as follows:

> *once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a Court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.* However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a Court in withholding the granting of immediately effective relief in a legislative apportionment case.... In awarding or withholding relief, a Court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a Court can reasonably endeavor to avoid the disruption of the election process which might result from requiring precipitate changes that could make unreasonable and embarrassing demands on a State in adjusting to the requirements of the Court's decree.

(emphasis added). *Reynolds* commended the district Court in that case for having given the state legislature an opportunity to alter its apportionment scheme voluntarily, as it "correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds,* 377 U.S. at 586, 84 S.Ct. at 1394.

The Court elaborated on these principles in *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), when it observed that

> [l]egislative bodies should not leave their reapportionment tasks to the federal Courts: but when those with legislative responsibilities do not respond, or the requirements of the state election laws make it impractical for them to do so, it becomes

the 'unwelcome obligation,' ... of the federal Court to devise and impose a reapportionment plan pending later legislative action.

(internal citation omitted).

Finally, the Court noted in *Upham v. Seamon,* 456 U.S. 37, 44, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982) that:

> It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. *Necessity has been the motivating factor in these situations.*

(citations omitted) (emphasis added).

It appears from these cases that the Court must determine whether the legislature has had an adequate opportunity to address the creation of a remedy for these unconstitutional districts and if so, whether "necessity" prevents this Court from ordering an interim plan. Other federal courts have concluded as much, recognizing that "[w]hile it is the duty of the legislature to redistrict the state, when the legislature is unable to adopt a redistricting plan, the obligation of devising a redistricting scheme falls upon the courts." *DeGrandy v. Wetherell,* 794 F.Supp. 1076, 1083 (N.D.Fla.1992) (*citing Wise,* 437 U.S. at 540, 98 S.Ct. at 2497) (emphasis added); *see also, Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977) (explaining that "[i]n the wake of a legislature's failure constitutionally to reconcile these conflicting state and federal goals, however, a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task."). While this Court acknowledges that "[c]ongressional redistricting is primarily the state legislature's task, [this task] becomes a judicial task when the legislature fails to redistrict after having an adequate opportunity to do so." *O'Sullivan v. Brier,* 540 F.Supp. 1200, 1202 (D.Kan. 1982) (*citing White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973)).

## B. The Facts

▮ Although a special legislative session could have been called this summer, the Governor declined to do so. Counsel for the Lieutenant Governor and Speaker of the House represented that calling a special session this summer would be an impractical and unwelcome solution, in part because the redistricting process is contentious and requires public consultation.

It is, of course, undisputed that the legislature could have enacted a new districting plan during its regular 1995 legislative session, but that they similarly declined to address the subject.

Notwithstanding the state's refusal to respond to this Court's judgment, it is contended by Bullock and Laney and others opposed to a Court-ordered remedy that the state has not really had a chance to address redistricting following the Supreme Court's decision. In addition to the noted time constraints, they observe that any legislation that might have been passed in a special session would not become effective for 90 days following the session. Further, any legislative plan would then have had to be pre-cleared by the Justice Department.

While neither this Court's extensive research nor the parties' voluminous pleadings have disclosed any factually controlling case, we conclude that the state has "failed to act" within the meaning of *Reynolds* and *Wise*. Nearly two years have passed since this Court identified the subject congressional districts as the products of overt racial gerrymandering, in the process discrediting a good deal of testimony offered for the state of Texas.[4] Notwithstanding the positions of the objecting defendants and *amici*, supplemented by affidavits of state legislators attesting to the difficulty of fashioning redistricting legislation, we are unpersuaded that the state has lacked an opportunity since June 13 to fashion its own remedy for these unconstitutional congressional districts. Proposed maps of amended districts have been in circulation for some time. The legislature actually held hearings on revising district boundaries in 1995. The convening of a special legislative session this summer was merely inconvenient, not impossible. As will be seen, the mechanics of conducting an election under new boundaries did not realistically impede the legislature from passing its own remedial plan.

Bullock and Laney[5] contend that the Texas Legislature is ready and willing to redistrict during its 1997 regular session. Of course, in any event, they will have that opportunity, as this Court's remedy is an interim plan and the Court will require the legislature to prepare its own constitutional redistricting plan next year. But Bullock and Laney's offer does not relieve this Court of the command of *Reynolds* that elections proceed under an unconstitutional redistricting plan only in the most "unusual case." This command is even more forceful in the present case because not one but two congressional election cycles have already occurred under the unconstitutional scheme. If the imperative of *Reynolds* is temporarily overlooked and a remedy is again withheld, the natural course of litigation over the remedial phase, particularly in this bitter dispute, could well prevent a remedy for the next two years. In that event, this Court will doubtless confront in 1998 the same arguments urging judicial inaction. The Governor, Bullock and Laney cannot have failed to calculate this possibility, yet they still refused to exercise the state's option to redistrict promptly.

▮ As the state has refused to redistrict, this Court must next determine whether as a matter of "necessity" to allow elections to go forward yet again under unconstitutional boundaries or to impose its own interim remedy under the authority and directives given us by *Reynolds, Wise,* and *Upham.*

---

4. Characterizations of evidence before the Court at the liability stage cannot, of course, include Governor Bush or Secretary of State Garza or their representatives, who did not hold office in 1994.

5. The Court focuses on the arguments of Bullock and Laney as representatives of the state legislature, but similar arguments were raised by the NAACP, the LULAC intervenors, the Department of Justice and the Members of Congress who were admitted as *amici curiae* after remand.

There is virtually no disagreement among the parties or *amici* that it is possible for the Court to redraw the boundaries of congressional districts 18, 29 and 30 and adjoining districts on an expedited basis so that the new districts can be employed in the November 1996 elections. This fact distinguishes the instant case from others cited by the parties in which courts declined to order interim relief. The Court relies on submissions of Secretary of State Tony Garza, Harris County Clerk Beverly Kauffman, Administrator of Elections for the County Clerk of Harris County, Tony Sirvello, and Dallas County Elections Administrator Bruce Sherbert in finding that a Court-ordered plan is not technically infeasible if the Court minimizes split "VTD's" (election precincts); orders an open primary to be held in conjunction with the November elections, followed, if need be, by runoff elections in December; and adjusts dates such as the candidate registration date and ballot-by-mail deadlines to accommodate the special election.

The defendants and *amici do*, however, raise a number of objections to an interim plan, which they contend render it impractical and imprudent to hold an open primary election in November for congressional districts affected by the interim plan.[6] These objections fall into four categories: the election process; the impact on voters; the impact on minority representation; and the impact on candidates.

The nature of those objections, and our evaluation of them, taken in light of the plan this court has prepared, will proceed in order:

1. *Impact of Redistricting on the Electoral Process*

As noted earlier, all parties agree that it is *feasible* to conduct open elections for affected congressional districts in 1996 in conjunction with the November presidential election. Defendants Bullock, Laney, Lawson and LULAC intervenors, and the congressional *amici* emphasize, however, the technical complications of doing so. The Court's remedial order will require a new filing deadline for candidates; minor adjustments for mail-in ballots; a prompt canvassing of the November election results; and the possible conduct of December 1996 runoff elections in some of the congressional districts. The objectors also point out the difficulty of adopting interim districts that comply with the requirements for Court-ordered remedial plans: population equality; compliance with §§ 2 and 5 of the Voting Rights Act; tailoring the districts as closely as possible to the scope of the violation; and effectuating "the legislative choices" in the previous districting plans.[7]

With regard to the first set of technical objections, this Court finds that the affidavits of election officials more fairly evaluate the challenges of conducting a November special election than do the arguments of the objectors. The election officials have given their advice concerning feasibility, and this Court has accepted it. Consequently, such details as minor adjustments in various election schedule deadlines neither compromise significantly state officials' ability to conduct a special election nor relieve this Court of its "unwelcome obligation" to redistrict as the Constitution commands. Moreover, the Court's remedial plan addresses the single most troubling and realistic hurdle, the potential splitting of voter tabulation districts ("VTD's"), by avoiding that consequence in all but a small handful of voting precincts.[8]

---

6. As acknowledged earlier, the objecting defendants and *amici* have supplemented their arguments through affidavits of state legislators and many other individuals attesting to the practical problems confronting court-ordered redistricting. *See, e.g.,* Affidavits of State Senator Mario Gallegos; State Senator Gonzalo Barriento; State Representative Delwin Jones; State Representative Jessica Farrar; Ron Kirk, Mayor of Dallas.

This Court has thoroughly reviewed all of the affidavits raising objections to court-ordered re-

districting and, for the reasons explained herein, finds these objections unavailing.

7. *See, e.g., Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *Upham,* 456 U.S. at 44, 102 S.Ct. at 1522.

8. Under this Court's plan, there are no split VTD's in Dallas County. There are, however, ten splits in Harris County. The Court finds this to be an acceptable amount of split VTD's. Some split VTD's are inevitable; any plan will have split VTD's because of the REDAPPL system's

Consequently, the Court has enabled election officials to avoid such problems as notifying voters that they reside in different precincts and training new or additional election officials to work in precincts with altered boundaries.

The second set of objections addresses the Court's ability to comply with the standards for Court-ordered interim districting plans. No doubt, the same objections will be raised to the plan the Court has devised. Nevertheless, this Court has endeavored in good faith to fulfill its obligations. Predominantly minority, urban congressional districts 18, 29 and 30 have been drawn with an eye for maintaining their compactness and contiguity. These districts, modeled from the Bullock/Laney proposed plans (plan C725) for Dallas and Harris counties, attempt to affect surrounding congressional districts to the minimum possible degree. Unfortunately, the radically gerrymandered structure of those districts, particularly in Dallas county, required considerable geographical alterations in order to conform the former districts to the requirements of the Constitution. The population variances within those districts are reported in the attached Exhibit A, and in only one congressional district do they exceed .34% (less than 2,000 voters) deviation from absolute population equality.[9] While the original 1991 Texas redistricting plan achieved zero population deviation, this could be done only through the use of census-block level redistricting, which was part and parcel of the state's unconstitutional technique of block-by-block racial gerrymandering.

This Court has refused to redistrict at the census block level, one of the most pernicious features of the 1991 plan. The VTD's in the affected districts are themselves now heavily influenced by the census-block districting not only for Congress, but also for state representative and senatorial districts, and they are consequently very uneven in population and boundaries. The Court utilized these VTD's as a second-best, interim solution, and minor population variances will necessarily arise from that methodology. The Court will view skeptically any final districting plan submitted by the state legislature that descends to districting at the census block level.

### 2. Impact on Voters

Those who object to a Court-ordered plan assert that voter "fatigue," voter confusion and voter ignorance will discourage participation in the affected districts in November special elections for Congress. They also assert that special elections in newly organized districts will effectively "disenfranchise" the voters of the choices they made in the primary elections in March. Likelihood of errors and reduced participation, it is feared, will arise not only from the new boundary lines but also because voters will be confronted with an open primary choice for the affected congressional races in addition to or as part of the November 1996 regular election ballot. Because Texas affords voters the option of pulling a straight-ticket lever, it is also speculated that voters will fail to realize they have to vote differently for the special election. Voters will allegedly also have no desire to participate in any run-off elections in December. Finally, because 13 congressional districts are affected by a Court-ordered plan, seven in Houston and six in Dallas, the objectors assert that nearly one-third of Texas voters will be in differently configured districts as of November.

Anytime changes are made in the election process, some risk of voter confusion or fatigue exists. What these objections ignore, however, is that the special elections will be conducted in tandem with the November 1996 presidential election, in which voter turnout is usually at historically high levels.[10]

---

reliance on census block lines when drawing precinct boundaries. See attached Exhibit B.

9. The single exception is District 29, with a .48% variance caused by the need to avoid a split VTD. See note 8 supra.

10. See, e.g., Letter of Secretary of State Garza, June 21, 1996, at 4; Affidavit of Dallas County Elections Administrator Bruce Sherbet (recognizing that "[a] November 5, 1996 special election would occur in conjunction with the Presidential election, and will result in the highest voter turnout and participation of any election in a four year cycle."); Affidavit of Michael D.

There is no reason to think that voters will decline to participate at the polls in November because of special elections; in fact, they need only visit their usual polling places to vote for President or in the Gramm–Morales U.S. Senate race and read the simple additional instructions for voting in the open congressional primary. Indeed, as some experts for the plaintiffs opined, the existence of more compact congressional districts ought to increase voter participation, as they heighten voters' interest and ability to participate in the elections. Significant drawbacks of the former racially gerrymandered districts included their tendency to inhibit voter understanding of the districts, to disable citizens and candidates from working effectively in campaigns, and to reduce voters' eagerness to participate in a racially segregated scheme devised by incumbents to maximize their odds for reelection. Compared with those disincentives, the holding of elections under more normally shaped, racially constitutional districts ought to cause less confusion.

As the objectors correctly noted, the voters will have to be educated concerning the need to vote separately in the special elections and the regular November election contests. This is a minor complication for the vast majority of voters in the urban areas affected by the interim plan, as they will already be confronted with literally dozens of electoral races in November.

Unlike the objectors, however, who paternalistically believe that the voters are not capable of understanding this ballot configuration, we find that the educational process will not be so difficult. Under the newly redrawn boundaries, candidates can identify the neighborhoods in which their strength is greatest, and they can mobilize door-to-door efforts to pass out sample, explanatory ballots in a way that was simply not possible under the gerrymandered districts. The voters can easily be informed that the straight-ticket lever does not reach the special elec-

tion. Through renewed communication between candidates, voters, and election officials, the electoral process can proceed with minimal voter confusion.

The concerns that runoff elections will be necessary in December, discouraging voter turnout, and that the voters' choices in March will be upended by the special elections are over-wrought. An expert witness for the plaintiffs predicted that the incumbent Congressmen will probably win majorities in the November elections in reconfigured "minority" districts. The defendants' expert was unwilling to predict the necessity for December runoff elections. This Court will not speculate where even the experts are uncertain, except to note that in the interim plan districts, the incumbents and challengers who are running remain viable candidates, with one possible exception.[11] Consequently, it is misleading to suggest that the voters' March primary choices have "disenfranchised" the voters or those election outcomes in any way.

Finally, while the objectors complain that the Court-ordered plan will arguably affect the districts in which one-third of the voters of Texas reside, this is an inevitable consequence of the magnitude and brazenness of the gerrymandering in which the Legislature engaged. A before and after comparison of the affected district maps graphically depicts the problem the Court faced.[12] The Court's plan endeavored to affect as few as possible of the state's voters, and outside the boundaries of districts 18, 29, 30 and immediately adjacent districts, relatively few voters have been moved into new or unfamiliar districts.

### 3. Impact on Minority Voters

The defendant objectors, intervenors and *amici* contend that conducting a special election for all affected congressional districts in November will particularly disadvantage minority voters, whom the "representatives" of their interests describe as easily confused,

Baselice (observing that "[v]oter participation is highest during a presidential election. Sixty-six percent (66%) of registered voters turned-out to vote in the 1988 presidential election whereas 73% of registered voters turned-out in 1992.").

**11.** The possible exception is Mr. Jack Rodriguez, the Republican candidate in District 29. *See* note 15 *infra.*

**12.** *See* attached Appendix.

readily discouraged from understanding the requirements of balloting, not well informed about voting procedures or precinct locations, and not sufficiently enthusiastic to participate in December run-off elections. To avoid these drawbacks, the NAACP intervenors have gone so far as to suggest that rather than provide for a special primary election, the Court should exercise an option under state law to declare the places on the ballot open and allow the organized political parties to appoint candidates who will run in November. No other party to the suit proposed this alternative. As the whole point of ordering an interim plan to remedy the unconstitutional gerrymandering is to allow the voters to select their congressional representatives, we must reject the NAACP's alternative out of hand.

The objectors' concerns about discouragement of minority participation are not persuasive. First, to the extent some voter confusion will arise from conducting a special election in concert with the 1996 presidential election, the likelihood of such confusion crosses racial boundaries and affects all voters equally. Second, the Court's redrawn boundaries, while far from perfect, will facilitate rather than hinder the candidates' ability to marshall their electoral forces and explain the ballot process to constituents. Few voters are being transferred into new VTD's, so the fear that minority voters will go to the wrong polling place is unfounded. Finally, one must compare the possibility of minimal voter confusion in 1996 with the magnitude of the existing constitutional violations and the level of confusion that has existed during the past two congressional election cycles. Viewed in this light, minority voters are not being disenfranchised so much as empowered by the creation of compact, reasonably contiguous districts that will better afford representation of their community and neighborhoods as well as personal interests in Congress.[13]

We must also differ with the assertion that because minority voters will not turnout pro-portionately to vote in the special elections, their electoral choices will not be adequately reflected in election outcomes. The objectors' testimony and expert affidavits failed to take into consideration that this is a presidential election year in which voter turnout, particularly among minority voters, will be especially high. Further, without finding that §§ 2 or 5 of the Voting Rights Act compels this Court to act, the Court has responded to the existing electoral configuration by drawing districts 18, 29 and 30 to include large numbers of minority voters. In 18 and 29, the concentration of black or Hispanic voters exceeds that proposed in the Bullock/Laney plan (C725). In district 30, effectuating the "legislative choice" to include Dallas–Fort Worth airport necessarily reduced the black voter concentration from that which exists presently, but the percentage remains higher than that proposed by Congresswoman Johnson (C735). The Court has thus attempted to address the legitimate concerns of minority voters consistent with the existing legislative plan and the directives of the Supreme Court in *Shaw* and *Miller*. We also point out that the incumbent Members of Congress in the "minority" districts are extremely popular and were each elected with substantial majorities. At least one expert predicted that these incumbents in particular will probably win outright minorities in November, pretermitting concern over diminished minority turnout in run-off elections. Finally, the fact that an Hispanic, Victor Morales, is running for the U.S. Senate, will undoubtedly draw Hispanic voters to the polls in November.

### 4. *Impact on Candidates*

Not surprisingly, some of the most vehement objections to conducting a special election in November have been raised by congressional incumbents, some of whom were admitted as *amici* on remand (Congress Members Jackson Lee, Green and Johnson

---

**13.** Expert testimony also supports this conclusion. *See, e.g.,* Affidavit of Denis D. Calabrese (attesting that, based on his experience as a political consultant, "not only would a November special election not be an impediment to minori-ty candidates, it is advantageous to them in some important ways. Moreover, it would be a great boon to all voters ... who would be relieved at long last of very confusing and unfair district lines.").

in districts 18, 29 and 30 respectively.).[14] In addition to the objections raised above, the candidates specifically complain in several ways about the interim plan. They assert that they have already invested money and resources in the November elections; that campaign strategies and advertising expenditure decisions have been made; that they may encounter problems with the Federal Election Commission regulations; and that they would have difficulty raising money on a short time schedule. Urging this Court not to preempt the state legislature's responsibility for redistricting, the incumbents observe that the Texas election machinery is already well in progress and that the "midpoint" of the 1996 election year has come and gone.

It is difficult to consider the incumbents' position compelling. The Fifth Circuit has held, in fact, that incumbents are entitled to little deference in the process of redistricting. *See Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir.1985) (explaining that "[m]any factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts."). All of the objecting incumbents have received the benefits of election in patently unconstitutional congressional districts in 1994 and some also in 1992. Four of the incumbent Members of Congress, Frost, Johnson, Bryant and Green, played significant roles in creating the unconstitutional districts. *See Vera v. Richards*, 861 F.Supp. at 1317–25. In any event, this Court's interim plan removes none of the incumbents from their districts,[15] and it is all but certain that every one except Bryant will run in the November special election. Moreover, as incumbents, they enjoy inestimable advantages in fundraising, maintaining name recognition, and in running on their records.

The incumbents' expressed concerns that they will face uncertainty with regard to Federal Election Commission law are somewhat difficult to understand and to credit. A Bullock/Laney submission contained an affidavit of a purported election specialist that identified potential FEC complications arising from the Court's plan. Plaintiffs responded, however, that the affiant has been heavily involved in Democratic politics, a fact undisclosed by Bullock/Laney, and the Plaintiffs raised a legitimate question about the veracity of some of his statements.

With regard to the costs already incurred in the campaigns, there was no specific evidence that this has not been money well spent. As has been repeatedly noted, campaigning should be easier, not harder in the newly configured districts. Moreover, candidates will have nearly four weeks to qualify for the November elections and three months to campaign. The latter time span is similar to the typical post-Labor Day focus of most political campaigns.

Finally, the incumbents assert that this Court's plan will have a decided partisan impact in election outcomes. No matter what the boundaries of the reconfigured plan, this challenge will be raised. The Court has, however, proceeded without respect to partisan impact. More than fifteen redistricting plans were filed with and considered by the Court. The Court began its efforts to fashion a plan with the Bullock/Laney proposals for Harris and Dallas counties (C725) and then adjusted the plan with an eye to smoothing the boundaries and maintaining communities of interest as well as the "legislative choices." The Court was then forced to adjust the populations in surrounding districts. The Court neither printed out partisan election statistics nor reviewed the partisan election statistics submitted by the parties or *amici* in this case. The Court has not evaluated the partisan impact of its actions. If anything, the relatively limited nature of the Court's remedial efforts, in com-

14. It is also worthy of note that counsel who represent these Members of Congress also represent Congressmen Martin Frost and Ken Bentsen, whose districts adjoin those declared unconstitutional by this Court. This Court denied intervention and *amici* status to those two congressmen.

15. Although this Court tried, with limited information, to ensure that challengers as well as incumbents reside in the interim districts, it appears that the residence of Mr. Jack Rodriguez, the Republican candidate in District 29, may have been placed in District 18. If correct, this unfortunate result was unavoidable.

parison with the remaining "ugliness"[16] of many of Texas's congressional districts, continues to provide incumbents a decided advantage over challengers in November special elections.

In sum, to the extent the concerns of incumbents ought to be considered by this Court, they are unpersuasive.

### Conclusion

Accordingly, the Plaintiffs' Motion for Remedy is GRANTED based on this opinion and the attached order and the Defendants' Motion for Stay of Remedy is DENIED.

### INTERIM ORDER REGARDING 1996 SPECIAL ELECTIONS

Pursuant to the Memorandum Opinion on Interim Remedy, signed on this day, the Court has redrawn the following congressional voting districts in Harris County, Texas and in Dallas County/Tarrant County, Texas:

**I. Harris County, Texas**
- A. District 7
- B. District 8
- C. District 9
- D. District 18
- E. District 22
- F. District 25
- G. District 29

**II. Dallas County/Tarrant County, Texas**
- A. District 3
- B. District 5
- C. District 6
- D. District 24
- E. District 26
- F. District 30

A list of the VTDs encompassed within each redrawn interim district is attached to this order as Exhibit A.

In Harris County, under the new plan, twelve VTD's are split by the congressional lines: VTD 0009 between Districts 18 and 29;

VTD 0049, between Districts 7 and 8; VTD 0132, between Districts 18 and 25; VTD 0166, between Districts 18 and 29; VTD 0172, between Districts 25 and 29; VTD 0209, between Districts 18 and 29; VTD 0294, between Districts 18 and 25; VTD 0392, between Districts 18 and 25; VTD 0396, between Districts 18 and 29; VTD 0422, between Districts 18 and 25; VTD 0543, between Districts 18 and 29; and VTD 063, between Districts 18 and 29. The split in two of these VTDs, i.e., VTD 0172 and 0209, has no practical effect and will require no reassignment of voters or issuance of new voter registration cards because 100% of the population resides wholly in one part of the divided VTD.

In Dallas County/Tarrant County the new plan splits only three VTDs: VTD 1224, between Districts 6, and 26; VTD 4410, between Districts 24 and 30; and VTD 4498, between Districts 6 and 24. In all three of these VTDs, however, the division has no practical effect and requires no reassignment of voters or issuance of new voter cards again because the entire population resides in one of the divided parts.

For the affected congressional districts, the Court

ORDERS that the following schedule for the special elections, to be held in conjunction with the general election in November 1996, is in effect:

*August 30, 1996:* deadline for open filing for seats in Congress and for all congressional candidates, including write-in candidates, to declare candidacy and for independent candidates to file petitions.

*September 5, 1996:* deadline for the Secretary of State to certify the names of candidates for the ballot for the November 1996 special elections to the counties in the redrawn districts.

*November 5, 1996:* the general election and the special election.

---

**16.** Representatives from both political parties urged this Court to unify Johnson County in one congressional district and to rationalize the distorted boundaries of the districts that irrationally split communities of interest and economic concern east of Houston; other obvious examples also abound. The Court, however, has no remedial mandate so broad as to address any other districts aside from those found unconstitutional: 18, 29, and 30. Perhaps the legislature, guided by new principles, will address these concerns in 1997.

*November 12, 1996:* the Governor shall canvass the results of the special election and order a runoff if necessary.

*December 10, 1996:* special election runoff, if necessary.

The Court deems all applications for early voting from foreign voters, if approved, to apply to the new districts and

ORDERS that appropriate ballots shall be issued to all approved applicants.

Unless otherwise specified, the applicable provisions of the Texas Election Code will govern the regular and special elections.

Regarding the motions still pending, for reasons apparent in the Memorandum Opinion on Interim Remedy and in this order, after careful consideration the Court

ORDERS that Plaintiffs' Motion for Remedy is GRANTED and Defendants' Motion To Stay Imposition of a Court–Ordered Remedy is DENIED.

The Court further

ORDERS that the Texas Legislative Council shall make available to the parties Plan C745, as set forth in the Court's Order of Limited Exception to the Confidentiality Order.

DIRECTS the Texas Legislature to draft congressional redistricting legislation for future elections by June 30, 1997. This interim order shall govern the 1996 elections only.

Finally, the Court will retain jurisdiction over these matters.

1354

**Unconstitutional Texas Congressional District 18**

**Texas Congressional District 18
Pursuant to Court-Ordered Plan**

**Unconstitutional Texas Congressional
District 29**

**Texas Congressional District 29
Pursuant to Court-Ordered Plan**

1358

**Unconstitutional Texas Congressional District 30**

**Texas Congressional District 30
Pursuant to Court-Ordered Plan**